**Slip Op. 99-138**

# United States Court of International Trade

|  |  |
|---|---|
| CUMMINS ENGINE COMPANY,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant, | Before: Pogue, Judge<br><br>Court No. 96-04-01274 |

[Defendant's motion for summary judgment is granted.]

Decided: December 21, 1999

Barnes, Richardson & Colburn, (Robert E. Burke, Lawrence M. Friedman, and David G. Forque) for Plaintiff.

David W. Ogden, Acting Assistant Attorney General, Joseph I. Liebman, Attorney-in-Charge, International Trade Field Office, Barbara S. Williams, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Beth C. Brotman, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service, Of Counsel, for Defendant.

## OPINION

**Pogue, Judge:** Defendant, the United States, moves for summary judgment pursuant to USCIT Rule 56. Plaintiff, Cummins Engine Company ("Cummins"), opposes Defendant's motion, asserting that summary judgment is not appropriate because genuine issues of material fact exist. Jurisdiction is predicated on 28 U.S.C. § 1581(a)(1994).

**Background**

On December 5th and 28th of 1995, Plaintiff filed protests challenging the decision of the U.S. Customs Service ("Customs") to deny duty-free treatment under the North American Free Trade Agreement ("NAFTA") to certain diesel engine crankshafts that Plaintiff imported from Mexico.  Under General Note 12(a)(ii), Harmonized Tariff Schedule of the United States ("HTSUS"), 19 U.S.C. § 1202 (1995), an imported good is eligible for NAFTA preferential duty treatment if it "originate[s] in the territory of a NAFTA party[.]"  See also 19 U.S.C. § 3332 (1994).  Where a good is not "wholly obtained or produced entirely" in the territory of a NAFTA country, the good must undergo "a change in tariff classification" within the NAFTA country in order to qualify as originating from that NAFTA country.  See General Note 12(b)(ii), HTSUS.

Here, the production of the imported crankshafts began in Brazil under the operation of Krupp Metalúrgica Campo Limpo, which manufactured crankshaft forgings from alloy steel.  Next, Cummins de Mexico, S.A. ("CUMMSA"), a wholly owned subsidiary of Plaintiff, imported the articles into Mexico and further processed them into the finished crankshafts that Plaintiff ultimately imported into

the United States.

Upon importation into the United States in June and July of 1995, Customs classified the crankshafts under subheading 8483.10.30, HTSUS (1995), covering other transmission shafts (including camshafts and crankshafts) and cranks, with a duty rate of 3.5% *ad valorem*. Plaintiff argues, however, that Customs should have classified the crankshafts under subheading (MX)8483.10.30, HTSUS,[1] as goods originating from a NAFTA country within the meaning of General Note 12(b)(ii), HTSUS.

According to Plaintiff, the articles were classifiable upon entry into Mexico under heading 7224, HTSUS (1995), as "semifinished products of other alloy steel[.]" Thus, because the articles were further processed within Mexico into finished crankshafts classifiable under subheading 8483.10.30, HTSUS, they underwent the tariff shift required to be deemed goods originating from a NAFTA country under General Note 12(b)(ii), HTSUS. Defendant denies that the goods underwent the required tariff shift, contending that they were already classifiable under subheading 8483.10.30, HTSUS, upon entering Mexico. Thus, the paramount issue before the Court is whether Customs' determination-

---

[1]The prefix "MX" indicates that the article is a product of Mexico and thus accorded NAFTA preferential tariff treatment.

-that the articles were classifiable under subheading 8483.10.30, HTSUS, upon entering Mexico--can be decided as a matter of law.

Plaintiff alleged the following three counts in its complaint: (1) because the crankshafts originate in a NAFTA country for purposes of duty preferences under General Note 12(a)(ii), HTSUS, Plaintiff's imports should be reliquidated as duty-free under NAFTA, see Pl.'s Second Am. Compl. ¶¶ 25, 28; (2) because Customs "improperly denied Plaintiff's claims for NAFTA preferential duty treatment prior to its commencement of a NAFTA origin verification as required under 19 C.F.R. § 181.71[,]" Plaintiff's imports should be reliquidated as duty-free under NAFTA, id. ¶¶ 31, 33; and (3) because the crankshafts underwent a substantial transformation in Mexico, they should be reliquidated duty-free under NAFTA as products of Mexico within the meaning of 19 U.S.C. § 1304, see id. ¶¶ 36, 37. Defendant moves for summary judgment in its favor on all three counts.[2]

## Undisputed Facts

This matter involves imports into the United States of diesel engine crankshafts in June and July of 1995. See Def.'s Statement

---

[2]Plaintiff moved this Court for an order granting oral argument. Because the issues presented are thoroughly addressed in the parties' briefs, however, Plaintiff's motion is denied.

of Undisputed Facts ¶ 1.[3]  The imported merchandise was exported
from Mexico by CUMMSA, a wholly-owned subsidiary of Plaintiff, the
importer.  See id. ¶ 2.

The manufacture of the imported crankshafts began in Brazil
with a closed-die forging process, which involves forging  between
matrices.  See id. ¶ 3.  After cooling, the articles were removed
from the dies, and their ends were milled (a machining process) to
allow them to be securely clamped into the machines used in the
machining operations performed in Mexico.  See id. ¶ 4; Pl.'s
Counterstatement to Def.'s Statement of Undisputed Facts ("Pl.'s
Counterstatement") ¶ 1; Def.'s Mem. in Reply to Pl.'s Opp'n to
Def.'s Mot. for SJ ("Def.'s Reply") at 4-5.  In addition, the
articles' mass centers (i.e., centers of balance) were established
by machining locator center points on each end.  See Def.'s
Statement of Undisputed Facts ¶ 4.  The mass centers were redone in
Mexico.  See Pl.'s Counterstatement ¶ 1; Def.'s Reply at 4-5.  Also
in Brazil, grease pockets, 50 mm in diameter and 13 mm deep, were
machined into the flange ends with a lathe.  See Def.'s Statement

---

[3]A party moving for summary judgment must submit to this
court a "concise statement of the material facts as to which the
moving party contends there is no genuine issue to be tried."
USCIT Rule 56(i).  "All material facts set forth in the statement
 . . . will be deemed to be admitted unless controverted . . . by
the opposing party."  Id.

of Undisputed Facts ¶ 5.  The design of the finished crankshaft requires a grease pocket.  See id.  Finally, the articles were subjected to shot blasting in Brazil.  See id. ¶ 6.

As imported into Mexico, the articles possessed the general shapes of crankshafts and were intended for use only as crankshafts.  See id. ¶ 16.  In Mexico, the articles underwent at least fourteen different machining operations, touching 95% of each article's surface.  See Pl.'s Counterstatement ¶ 2; Def.'s Reply at 4-5.  The machining processes performed in Mexico removed up to one-third of the material from certain areas of the articles and between one-third and two-fifths of an inch of steel from other areas.  See Pl.'s Counterstatement ¶ 2; Def.'s Reply at 4-5.

In response to a letter from Plaintiff dated June 23, 1995, Customs issued an advance ruling, NY 811617 (July 27, 1995), pursuant to 19 C.F.R. § 181.92 (1995), which notified Plaintiff that the imported crankshafts were not entitled to NAFTA duty preference.  See Def.'s Statement of Undisputed Facts ¶ 17.  After Plaintiff's initiation of this action in this Court, Customs conducted an origin verification pursuant to 19 C.F.R. § 181.72 (1995), which confirmed Customs' earlier findings set forth in NY 811617.  See id.

## Standard of Review

Pursuant to USCIT Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT Rule 56(d); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering whether material facts are in dispute, the Court must consider the evidence in a light most favorable to the non-moving party, drawing all reasonable inferences in its favor, as well as all doubts over factual issues. See Anderson, 477 U.S. at 255; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Nevertheless, "[w]hen a motion for summary judgment is made and supported . . . , an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." USCIT Rule 56(f).

Count I of Plaintiff's complaint requires the Court to apply the NAFTA origination rules. In doing so, the Court must review Customs' classification of the articles upon their entry into Mexico as crankshafts under subheading 8483.10.30, HTSUS. The

Court analyzes a classification issue in two steps: "first, [it]

construe[s] the relevant classification headings; and second, [it]

determine[s] under which of the properly construed tariff terms the

merchandise at issue falls." Bausch & Lomb, Inc. v. United States,

148 F.3d 1363, 1365 (Fed. Cir. 1998)(citing Universal Elecs., Inc.

v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997)). Whether the

merchandise is properly classified is ultimately a question of

law.[4] See id. Summary judgment is therefore appropriate "when

---

[4]The Supreme Court's recent holding in United States v.
Haggar Apparel Co., 526 U.S. ___, 67 U.S.L.W. 4249 (U.S. Apr. 21,
1999), raised questions concerning the standard of review
applicable to Customs' interpretation of the meaning and scope of
tariff terms. See Avenues in Leather, Inc. v. United States, 178
F.3d 1241, 1244 (Fed. Cir. 1999). In Haggar, the Supreme Court
held that if an HTSUS provision is ambiguous and Customs
promulgates a regulation that fills a gap or defines a term in a
way that is reasonable in light of the legislature's revealed
design, courts should afford the interpretation the deference
articulated in Chevron U.S.A. Inc. v. Natural Resources Defense
Council, Inc., 467 U.S. 837, 844 (1984). Haggar, 526 U.S. at __,
67 U.S.L.W. at 4252-53.
       In The Mead Corp. v. United States, 185 F.3d 1304 (Fed. Cir.
1999), however, the Federal Circuit held that Haggar does not
apply where Customs "merely issue[s] a classification ruling
implicitly interpreting an HTSUS provision." 185 F.3d at 1307.
Recognizing Mead, Defendant nevertheless argues that its legal
interpretations of the tariff schedule here should be accorded
Chevron deference. See Def.'s Reply at 2 n.2. The Court
disagrees.
       Specifically, in Mead, the Federal Circuit declined to grant
Chevron deference to a Customs ruling issued under 19 C.F.R. §§
177.0-177.12 (1998). See Mead, 185 F.3d at 1307. The court
explained that such rulings "do not carry the force of law and
are not, like regulations, intended to clarify the rights and
obligations of importers beyond the specific case under review.

there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is."   Id.


**Discussion**

**I.  The NAFTA Origination Rules**

The HTSUS consists of (A) the General Notes; (B) the General Rules of Interpretation; (C) the Additional U.S. Rules of Interpretation; (D) sections I to XXII, inclusive (encompassing chapters 1 to 99, and including all section and chapter notes, article provisions, and tariff and other treatment accorded

---

Instead, a ruling merely interprets and applies Customs laws to a 'specific set of facts.'" Id. (citing 19 C.F.R. § 177.1(d)(1) (defining "ruling")); see also 1 Kenneth Culp Davis and Richard J. Pierce, Jr., Administrative Law Treatise § 3.5 (1994)(discussing the scope of Chevron); Robert A. Anthony, Which Agency Interpretations Should Bind Citizens and the Courts?, 7 Yale J. on Reg. 1 (1990)(arguing that an agency's legal interpretation in a formal format, such as a legislative regulation, should be afforded Chevron deference, but that an agency's legal interpretation in a less formal format, such as a letter or guideline, should not be afforded Chevron deference). Here, Customs issued a NAFTA advance ruling pursuant to 19 C.F.R. § 181.99 (1995), determining that the imported crankshafts did not originate in a NAFTA country.  See NY 811617 (July 27, 1995).  Similar to Customs classification rulings under 19 C.F.R. 177.0, NAFTA advance rulings are neither precedential nor carry the force of law, see 19 C.F.R. § 181.100(3)(1995), but merely apply the NAFTA laws to a "specific set of facts," see 19 C.F.R. § 181.92 (1995). Therefore, the principles denying Chevron deference to standard Customs rulings in Mead apply with equal force to the NAFTA advance ruling issued here.  The Court will not afford Chevron deference to the legal interpretations of the HTSUS articulated in Customs' negative origin determination.

thereto); and (E) the Chemical Appendix.

The proper classification of merchandise is governed by the General Rules of Interpretation ("GRI") to the HTSUS.  See Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). GRI 1 provides that, "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes . . . ."  GRI 1, HTSUS; see also Orlando Food Corp., 140 F.3d at 1440; Harmonized Commodity Description and Coding System, Explanatory Notes (1st ed. 1986)("Explanatory Notes") at 1 ("[T]he terms of the headings and any relative Section or Chapter Notes are paramount, i.e., they are the first consideration in determining classification.").[5]

In reviewing whether the subject goods underwent a tariff shift in Mexico as required by General Note 12(b)(ii), HTSUS, the Court must determine whether Customs' decision that the subject articles were covered by subheading 8483.10.30, HTSUS, upon importation into Mexico is correct as a matter of law.  Plaintiff

---

[5]The Explanatory Notes "provide a commentary on the scope of each heading of the Harmonized [Tariff] System and are thus useful in ascertaining the classification of merchandise under the system."  H.R. Conf. Rep. No. 576, 100th Cong., 2nd Sess. 549 (1988).  It has long been settled that, "[w]hile the Explanatory Notes do not constitute controlling legislative history, they do offer guidance in interpreting HTS[US] subheadings."  Lonza, Inc. v. United States, 46 F.3d 1098, 1109 (Fed. Cir. 1995).

argues that this dispute requires resolution of genuine issues of fact and that, therefore, summary judgment is not appropriate. Plaintiff maintains that the articles were classifiable under heading 7224, HTSUS, upon importation into Mexico.

Note 1(f) to Section XV, HTSUS (1995)(which includes Chapter 72), states that the section does not cover articles of Section XVI, HTSUS (1995)(which includes Chapter 84). Therefore, Defendant counters that, if the articles were covered by subheading 8483.10.30, HTSUS, upon importation into Mexico, they must be classified as such, even if they were also classifiable under heading 7224, HTSUS. See Def.'s Reply at 2.

Defendant relies on GRI 2(a) in arguing that the articles were classifiable under subheading 8483.10.30, HTSUS, upon entering Mexico. See Mem. in Supp. of Def.'s Mot. for SJ at 19-20. That rule provides, "Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as presented, the incomplete or unfinished article has the essential character of the complete or finished article." GRI 2(a). Defendant contends the articles possessed the "essential character" of a complete or finished crankshaft upon entering Mexico; therefore, they were at that time classifiable under subheading 8483.10.30, HTSUS, as unfinished

crankshafts.  <u>See</u> Mem. in Supp. of Mot. for SJ at 20.

Although the articles at issue may indeed have been classifiable as Defendant maintains, the Explanatory Note to GRI 2(a) provides,

> The provisions of [GRI 2(a)] also apply to blanks unless these are specified in a particular heading.  The term "blank" means an article, not ready for direct use, having the approximate shape or outline of the finished article . . . , and which can only be used, other than in exceptional cases, for completion into the finished article . . . . Semi-manufactures not yet having the essential shape of the finished articles . . . are not regarded as "blanks."

Explanatory Notes at 2.

Here, it is undisputed that the articles upon importation into Mexico had the general shape of crankshafts and were intended for use solely as crankshafts.  <u>See</u> Def.'s Statement of Undisputed Facts ¶ 16.  Therefore, interpreting the undisputed facts in a light most favorable to the non-moving party, the Court infers that the articles were "blanks" within the meaning of the Explanatory Note to GRI 2(a).  Consequently, if, upon entering Mexico, the Plaintiff's goods could have been provided for elsewhere as blanks, then they were not correctly classified under subheading 8483.10.30, HTSUS, as a matter of law.  Thus, despite Section XV, Note 1(f), the Court must first address whether the articles were classifiable under heading 7224, HTSUS.

**A) Heading 7224, HTSUS**

Heading 7224, HTSUS, covers "semifinished products of other alloy steel."  Chapter 72, Note 1(ij), HTSUS (1995), defines "semifinished products" as "[o]ther products of solid section, which have not been further worked than . . . roughly shaped by forging, including blanks for angles, shapes or sections."  Chapter 72, Note 1 (ij) expressly covers blanks.  Therefore, in reviewing whether the subject imports were classifiable under heading 7224, HTSUS, upon entering Mexico, the Court must address whether at that time they were "not . . . further worked than . . . roughly shaped by forging," so as to constitute a blank.

Chapter 72, U.S. Additional Note 2, HTSUS (1995), states,

> For the purposes of this chapter, unless the context provides otherwise, the term "further worked" refers to products subjected to any of the following surface treatments:  polishing and burnishing;  artificial oxidation;  chemical surface treatments such as phosphatizing, oxalating and borating;  coating with metal;  coating with nonmetallic substances (e.g., enameling, varnishing, lacquering, painting, coating with plastics materials);  or cladding.

Plaintiff argues that, because it is undisputed that the articles had not undergone any of the processes listed above in Brazil, they were not "further worked" within the meaning of Chapter 72 before entering Mexico.  See Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ at 10-11.  The definition of "further worked,"

however, is not limited to the note's listed surface treatments.

U.S. Additional Note 2 expressly states that the term "further

worked" constitutes the listed surface treatments "unless the

context provides otherwise[.]" Chapter 72, U.S. Additional Note 2,

HTSUS.  In this case, the context provides otherwise.

Chapter 72, Note 1(ij), HTSUS, defines "semifinished products

of other alloy steel" as products that have "not been further

worked than . . . roughly shaped by forging[.]"  To read

"further worked" as limited to surface treatments would render

unnecessary the subsequent qualifying language, "than . . . roughly

shaped by forging."  The Court "should construe the statute, if at

all possible, to give effect and meaning to all the terms."  Bausch

& Lomb, 148 F.3d at 1367 (citing United States v. Menasche, 348

U.S. 528, 539 (1955)).  Therefore, in this context, the term

"further worked" is more appropriately defined by its common

meaning, which is "to form, fashion, or shape an existing product

to a greater extent."  Winter-Wolff, Inc. v. United States, 22 CIT

__, ___, 996 F. Supp. 1258, 1265 (1998) (determining that "further

worked" as used in heading 7607, HTSUS, should be defined in

accordance with its common meaning).[6]

---

[6]Defendant cites various cases decided under analogous prior
tariff provisions in support of its argument that the articles
were "further worked" within the meaning of Chapter 72, Note

As previously noted, it is undisputed that in Brazil: (1) the articles were subjected to shot blasting, see Def.'s Statement of Undisputed Facts ¶ 6; (2) the articles' mass centers were established by machining locator center points on each end, see id. ¶ 4; and (3) grease pockets were machined into the articles'

_____

1(ij), HTSUS.  See Mem. in Supp. of Def.'s Mot. for SJ at 10-11 (citing United States v. Anderson & Co., 2 Ct. Cust. 350 (1911); Edward W. Daniel Co. v. United States, 67 Cust. Ct. 132 (1971); Ford Motor Co. v. United States, 19 C.C.P.A. 69 (1931); W.R. Filbin & Co., Inc. v. United States, 63 Cust. Ct. 200, 306 F. Supp. 440 (1969); E. Dillingham, Inc. v. United States, 61 Cust. Ct. 33 (1968)).  Each of the cited cases reviewed one of the following prior tariff provisions: (1) Tariff Schedules of the United States ("TSUS") Item 608.25, TSUS (1967), which provided for forgings "not machined, not tooled, and not otherwise processed after forging"; (2) Paragraph 319(a) of the Tariff Act of 1930, which provided for forgings "not machined, tooled, or otherwise advanced in condition by any process or operation subsequent to the forging process"; (3) Paragraph 123 of the Tariff Act of 1909, which provided for forgings "not machined, tooled, or otherwise advanced in condition by any process or operation subsequent to the forging process[.]"

"Where the text of a tariff provision has undergone only minor changes from the TSUS to the HTSUS, the high values of uniformity and predictability . . . counsel courts to credit prior decisions interpreting the TSUS provision."  Hewlett-Packard Co. v. United States, 189 F.3d 1346, 1349 (Fed. Cir. 1999)(citing Pima Western, Inc. v. United States, 20 CIT 110, 116-17, 915 F. Supp. 399, 404-05 (1996); H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 515, 549-50 (1988)).  Here, however, the language of Chapter 72, Note (ij), HTSUS, is significantly different than that used in the prior provisions.  Therefore, Defendant's cited cases are not determinative of the matter at hand.  See Mitsubishi Int'l Corp. v. United States, 182 F.3d 884, 886 (Fed. Cir. 1999)(holding that a judgment interpreting provisions of the TSUS "does not apply to classifications made under differing language of the more recently enacted HTSUS").

flanged ends with a lathe, see id. ¶ 5.  Defendant argues that these processes demonstrate that the articles were "further worked than . . . roughly shaped by forging" in Brazil, and therefore, the articles did not enter Mexico as "semifinished products of other alloy steel" within the meaning of heading 7224, HTSUS.  See Mem. in Supp. of Def.'s Mot. for SJ at 8-9.

Shot blasting is the use of abrasive particles to strike and to remove dirt and oxide from the surface of a metal workpiece. See Dep. of Robert D. Kraft at 63 (Ex. B to Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ).  Interpreting this evidence in a light most favorable to the non-moving party, it is possible to infer that shot blasting does not constitute "further work" because it does not appear to form, fashion, or shape the article to a greater extent.  See  Winter-Wolff, 22 CIT at ___, 996 F. Supp. at 1265.

Regarding the mass centering, it appears that the articles were center marked in Brazil so that they could be properly positioned in the machinery that further shaped the articles in Mexico, see Pl.'s Resp. to Def.'s First Interrogs., No. 11(b)(7) (Ex. D to Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ), and it is undisputed that the mass centers were redone in Mexico, see Pl.'s Counterstatement ¶ 1; Def.'s Reply at 4-5.  Thus, it is reasonably inferable that the mass centering was incidental--rather than

further work--as it was performed merely in preparation for further shaping and not to effect the final shape of the product.

It is undisputed, however, that the grease pocket machined into the article in Brazil is 50 mm in diameter and 13 mm deep; is not redone, processed, or touched in any way in Mexico; and "exists for the use of the finished crankshaft in a vehicle."  Def.'s Statement of Undisputed Facts ¶ 5.  The machining of the grease pocket, therefore, literally meets the common meaning of "further work," as it alters the shape of the article to a greater extent, particularly since the grease pocket is designed for use in the completed crankshaft.

"Even when merchandise falls within the literal language of the statute, however, such literal interpretation should be rejected if it produces a result contrary to the apparent legislative intent." Chevron Chemical Co. v. United States, 23 CIT ___, ___, 59 F. Supp.2d 1361, 1365 (1999)(citing Procter & Gamble Mfg. Co. v. United States, 19 C.C.P.A. 415, 419 (1932)); see also EM Indus., Inc. v. United States, 22 CIT ___, ___, 999 F. Supp. 1473, 1478-79 (1998)("While construing a statute so as to carry out the legislative intent requires that the court first look to the statutory language itself, . . . , that does not mean . . . the court is foreclosed from also considering readily available

guidance from the Explanatory Notes as to the intended scope of subheadings.")(citation omitted).

The precise issue is whether the machining of the grease pocket constitutes further work than "roughly shaped by forging" upon entering Mexico. The Explanatory Note defines "pieces roughly shaped by forging" as follows:

> These are semi-finished products of rough appearance and large dimensional tolerances, produced from blocks or ingots by the action of power hammers or forging presses. They may take the form of crude recognisable [sic] shapes in order that the final article can be fabricated without excessive waste, but the heading covers ONLY those pieces which require considerable further shaping in the forge, press, lathe, etc. The heading would, for example, cover an ingot roughly hammered into the shape of a flattened zig-zag and requiring further shaping to produce a marine crankshaft, but it would NOT COVER a crankshaft forging ready for final machining. The heading similarly EXCLUDES drop forgings and pressings produced by forging between matrices since the articles produced by these operations are ready for final machining.

Explanatory Note 72.07(B) at 992.[7]

Pointing to the last sentence of the Explanatory Note, Defendant argues that, because it is undisputed that the articles as imported into Mexico were "pressings produced by forging between matrices," a closed-die forging operation, the plain language of

---

[7]The Explanatory Note to heading 7224, HTSUS, explains that the provisions of the Explanatory Note to heading 7207, HTSUS, apply, *mutatis mutandis*, to the products of heading 7224, HTSUS. See Explanatory Note 72.24 at 1010.

the Explanatory Note excludes the articles from heading 7224.  See Mem. in Supp. of Def.'s Mot. for SJ at 13.  The subsequent qualifying language, however, is more instructive.  That language provides that the heading excludes these types of forgings "since the articles produced by these operations are ready for final machining."  Explanatory Note 72.07(B) at 992 (emphasis added).

Neither the HTSUS nor its legislative history expressly defines "final machining."  Defendant argues that "final machining" as used in the Explanatory Note "means the less significant machining done on forgings created by closed-die or drop forging processes."  Def.'s Mem. in Supp. of Def.'s Mot. for SJ at 15. Accordingly, Defendant contends the Explanatory Note explains that heading 7224 covers only articles produced by open-die forging, excluding those produced by closed-die and drop forging.  See id. at 17-18.  Because it is undisputed that the articles here were produced by closed-die forging in Brazil, Defendant argues that they were "ready for final machining" upon entering Mexico and were therefore not classifiable under heading 7224, HTSUS.

Defendant's argument has some appeal.  Open-die forging has been defined as "[t]he hot mechanical forming of metals between flat or shaped dies in which metal flow is not completely restricted."  Metals Handbook, Vol. 14 Forming and Forging 9

(Joseph R. Davis ed., 9th ed. 1988). An open-die forging "require[s] significant machining to achieve a finished part." Handbook of Manufacturing Engineering 721 (Jack M. Walker ed., 1996).

Closed-die forging has been defined as "[t]he shaping of hot metal completely within the walls of cavities of two dies that come together to enclose the workpiece on all sides." Metals Handbook, Vol. 14 Forming and Forging 2 (Joseph R. Davis ed., 9th ed. 1988). "With the use of closed dies, complex shapes and heavy reductions can be made in hot metal within closer dimensional tolerances than are usually feasible with open dies." Id. at 75. Unlike open-die forgings, "[c]losed-die forgings are usually designed to require minimal subsequent machining." Id.

Finally, drop forging has been defined as "[t]he forging obtained by hammering metal in a pair of closed dies to produce the form in the finishing impression under a drop hammer[.]" Id. at 5. Drop forging is used "where precise dimensions are required[.]" Van Nostrand's Scientific Encyclopedia 1611 (Douglas M. Considine ed., 7th ed. 1989).

Under Defendant's theory, "pressings produced by forging between matrices" refers to closed-die forging. Thus, because drop forging produces precise dimensions and closed-die forging usually

requires minimal subsequent machining, Defendant argues that "final machining" in the context of the Explanatory Note means "the less significant machining required after closed-die or drop forging." Mem. in Supp. of Def.'s Mot. for SJ at 19.  It is undisputed that the articles were produced by closed-die forging in Brazil; thus, Defendant concludes the articles were not classifiable under heading 7224, HTSUS, upon importation into Mexico.

There are, however, two main flaws with Defendant's proferred definition of "final machining."  First, open-die forgings are also produced between matrices, i.e., dies.  See Metals Handbook, Vol. 14 Forming and Forging 9, 61 (Joseph R. Davis ed., 9th ed. 1988). Therefore, it is not clear that the Explanatory Note's use of "pressings produced by forging between matrices" was intended only to refer to closed-die forgings.  Second, although closed-die forging generally produces pieces that require only minimal subsequent machining, this is not always the case.  See id. at 75. ("Closed-die forgings are usually designed to require minimal subsequent machining.")(emphasis added).  Thus, because it is not clear that "final machining" was intended to be limited to the type of machining following closed-die and drop forging processes, the Court declines to adopt Defendant's definition of the term.

Alternatively, Plaintiff--citing the depositions of two

industry representatives--contends that "final machining" is analogous to "finish machining," which is known in the industry as the machining step that creates the final shape, size, and surface finish of an article. See Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ at 15; Pl.'s Statement of Facts as to Which There Is a Genuine Issue of Material Fact ¶ 3.

"When a tariff term is not defined in the HTSUS or its legislative history, the term's correct meaning is its common meaning." Pillowtex Corp. v. United States, 171 F.3d 1370, 1374 (Fed. Cir. 1999)(citing Mita Copystar Am. V. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994)). In ascertaining the common meaning of a tariff term, "the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." Brookside Veneers, Ltd. v. United States, 847 F.2d 786, 789 (Fed. Cir. 1988). Although here the term "final machining" appears in the Explanatory Notes, and not the tariff provision, the same analysis serves as an appropriate guideline.

"Final" is defined as: "1. Forming or occurring at the end: LAST[;] 2. Of, relating to, or constituting the last element in a series, process, or procedure." Webster's II, New Riverside University Dictionary 478 (1988). In the context of metal-working,

"machining" is defined as: "Any one of a group of operations that change the shape, surface finish, or mechanical properties of a [metal workpiece] by the application of special tools and equipment. Machining almost always is a process where a cutting tool removes material to effect the desired change in the workpiece." 10 McGraw-Hill Encyclopedia of Science & Technology 275 (8th ed. 1997); accord Handbook of Manufacturing Engineering 52 (Jack M. Walker ed., 1996). Thus, the Court construes the common meaning of "final machining" as the end or last step in a series of steps changing the shape, surface finish, or mechanical properties of a piece of metal.

This definition of final machining is consistent with the Explanatory Note's more general instruction that "the heading covers ONLY those pieces which require considerable further shaping in the forge, press, lathe, etc." Explanatory Note 72.07(B) at 992. A lathe is a machine tool that changes the shape, finish, or size of a piece of metal by cutting off chips. See Handbook of Manufacturing Engineering 53 (Jack M. Walker ed., 1996). Therefore, by including the lathe in its list of tools that may considerably further shape the metal workpiece--as well as by the use of "etc."--the Explanatory Note indicates that the definition of "pieces roughly shaped by forging" includes pieces that require

considerable further shaping by machining.  Those pieces that merely require the last stage of modifying the article's shape by machining, i.e., final machining, are excluded.

Moreover, this line of the Explanatory Note is more instructive because it sets out a general rule for determining whether a metal workpiece is merely "roughly shaped by forging." Thus, employing the definition set out in Explanatory Note 72.07(B), for metal pieces to be deemed "roughly shaped by forging," it is paramount that they "require considerable further shaping in the forge, press, lathe, etc.[,]" being of "rough appearance and large dimensional tolerances[.]" Consistently, Chapter Note 1(ij) indicates that blanks, which have "the approximate shape or outline of the finished article[,]" see Explanatory Notes at 2, are an example of pieces that have not been further worked than roughly shaped by forging.

As required by USCIT Rule 56(f), Plaintiff has "set forth specific facts showing that there is a genuine issue" regarding whether the articles, upon their entry into Mexico, required considerable further shaping and exhibited rough appearances and large dimensional tolerances.

Regarding whether the articles still required considerable shaping upon entering Mexico, Plaintiff claims that the articles

underwent fourteen different machining operations in Mexico covering 95% of each article's surface area. See Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ at 3, 12 (citing Dep. of Contreras at 89-90, Ex. C). Plaintiff also states that the machining in Mexico removed up to one-third of the material from certain areas of each article and between one-third and two-fifths of an inch of steel from other areas.[8] See Pl.'s Counterstatement ¶ 2 (citing Dep. of Kraft, Ex. B). Finally, Plaintiff explains that approximately 21% of the mass of each article was removed in Mexico. See Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ at 3 (citing Dep. of Contreras at 81-82, Ex. C). Each of these facts also supports a finding that the articles were of "rough appearance" upon entering Mexico.

Tolerances measure the accuracy of the metal workpiece's dimensions. See Handbook of Manufacturing Engineering 100 (Jack M. Walker ed., 1996). A "near-net-shape" forging exhibits close dimensional tolerances and requires little, if any, subsequent machining to achieve the finished product. See id. Plaintiff claims that, before entering Mexico, the articles had "tolerances on the order of 254 microns in total tolerance on the forging diameters." Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ at 9 (citing Dep. of Contreras at 51, Ex. C). Within Mexico, their surfaces

_____

[8]Each of the foregoing facts is undisputed.

were "machined to within 26 microns in total tolerance on these same diameters." Id. This approximately tenfold ratio of tolerances between the article prior to entry in Mexico and the finished product supports a finding that the articles exhibited "large tolerances" upon entering Mexico.

Defendant concedes that Plaintiff has put forth evidence supporting these points, but argues that summary judgment is nevertheless appropriate because they are not material. The Court agrees. Plaintiff may be able to prove at trial that each article required considerable further shaping upon entering Mexico. Nevertheless, the undisputed fact that a grease pocket was machined into the article in Brazil indicates that it was "further worked than . . . roughly shaped by forging" within the meaning of Chapter 72 Note (ij) because the machining of the grease pocket constituted the first step toward accomplishing the considerable further shaping. Therefore, the subject articles were not classifiable as "semifinished products of other alloy steel" under heading 7224, HTSUS, as a matter of law.

### B) Heading 8483, HTSUS

Having held that the articles were not classifiable under heading 7224, HTSUS, upon entry into Mexico, the Court reviews whether they were classifiable as unfinished crankshafts under

subheading 8483.10.30, HTSUS, as Defendant maintains. As previously noted, Defendant relies on GRI 2(a) in arguing that the articles were classifiable under subheading 8483.10.30, HTSUS, upon entry into Mexico. See Mem. in Supp. of Def.'s Mot. for SJ at 19-20. That rule states, "Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as presented, the incomplete or unfinished article has the essential character of the complete or finished article." GRI 2(a).

Defendant argues the articles had the essential character of crankshafts upon entry into Mexico "as it is uncontested that [they were] the actual bod[ies] of the crankshaft[s], [were] intended for use only as crankshafts, [had] the general shape[s] of the imported crankshafts, and nothing [was] added in Mexico to the [articles] to make them finished crankshafts." Mem. in Supp. of Def.'s Mot. for SJ at 20. Plaintiff counters that the "four factors cited by Defendant as those imparting the essential character to the rough forgings in question are simply not relevant." Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ at 17. In addition, Plaintiff argues that Defendant's classification fails to take into account numerous essential characteristics of a finished crankshaft that the subject articles lacked upon entering Mexico: surface condition, final

balance, and hardness.  See id. at 19-20.

As previously noted, however, the Explanatory Note to GRI 2(a)
states,

> The provisions of [GRI 2(a)] also apply to blanks unless
> these are specified in a particular heading.  The term
> "blank" means an article, not ready for direct use,
> having the approximate shape or outline of the finished
> article . . . , and which can only be used, other than in
> exceptional cases, for completion into the finished
> article . . . .

Explanatory Notes at 2.  Here, it is undisputed that the articles
upon importation into Mexico had the general shape of crankshafts
and were intended for use solely as crankshafts.  See Def.'s
Statement of Undisputed Facts ¶ 16.  Pursuant to the Explanatory
Note, then, the subject articles were at least blanks upon entering
Mexico.  Therefore, employing GRI 2(a), because the articles were
not provided for elsewhere in the HTSUS as blanks, Customs
correctly determined that they were classifiable under subheading
8483.10.30, HTSUS, as unfinished crankshafts upon entering Mexico.[9]

_____

[9]The conclusion that the articles were properly classifiable
under heading 8483, HTSUS, as unfinished crankshafts is bolstered
by the General Notes to Sub-Chapter IV of Chapter 72, HTSUS,
which covers heading 7224, HTSUS.  See Explanatory Notes at 1009.
The General Explanatory Notes instruct that semifinished products
of other alloy steel under heading 7224, HTSUS, "may be worked
provided that they do not thereby assume the character of
articles or of products falling in other headings[.]"  Id.

**C) Conclusion**

Because the subject articles were classifiable under subheading 8483.10.30, HTSUS, upon entering and departing Mexico, Customs properly determined that they did not undergo a change in tariff classification in Mexico within the meaning of General Note 12(b)(ii), HTSUS.   Thus, the articles did not qualify as originating in the territory of a NAFTA party.   The Court grants Defendant's motion for summary judgment on this issue.

**II.  Customs' Failure to Conduct a Timely Origin Verification**

Customs regulations provide,

> Except where a Certificate of Origin either is not submitted when requested . . . or is not acceptable . . . , Customs shall deny or withhold preferential tariff treatment on an imported good . . . only after initiation of an origin verification . . . which results in a determination that the imported good does not qualify as an originating good or should not be accorded such treatment for any other reason as specifically provided for elsewhere in this part.

19 C.F.R. § 181.71 (1995).  Here, however, although Plaintiff submitted a Certificate of Origin,[10] Customs did not conduct an

---

[10]A Certificate of Origin is a document certifying that a "good being exported . . . from Canada or Mexico into the United States qualifies as an originating good for purposes of preferential tariff treatment under the NAFTA."  19 C.F.R. § 181.11 (1995).  To claim NAFTA preferential treatment, the U.S. importer must "make a written declaration that the good qualifies for such treatment . . . based on a complete . . . Certificate of

origin verification, as prescribed in 19 C.F.R. § 181.72 (1995), before denying the imported crankshafts NAFTA preferential treatment.

Instead, Customs denied Plaintiff's claim for NAFTA preferential tariff treatment in an advance ruling issued pursuant to 19 C.F.R. §§ 181.91-181.102 (1995). See NY 811617 (July 27, 1995). The imported crankshafts entered the United States in June and July of 1995. By letter dated June 23, 1995, Plaintiff requested a ruling on whether the crankshafts qualified for NAFTA preferential treatment. In response, Customs issued its advance ruling on July 27, 1995, determining that the crankshafts did not qualify as "goods originating in the territory of a NAFTA party" within the meaning of General Note 12(b)(ii), HTSUS. Subsequently, Customs liquidated the goods, classifying them under subheading 8483.10.30, HTSUS, with a duty rate of 3.5% *ad valorem*. Plaintiff protested the liquidations in December of 1995. After Customs denied the protests, Plaintiff commenced the instant action by filing a summons on April 25, 1996.

Some time after the filing of Plaintiff's action, Customs

---

Origin[.]" 19 C.F.R. § 181.21 (1995). Here, it is apparent that Plaintiff based its claim for NAFTA preferential treatment on a properly executed Certificate of Origin. See Def.'s Mem. in Supp. of Mot. for Remand to Customs and to Extend Time in Which Def.'s Response to the Complaint Is Due, Ex. A.

realized that it had failed to conduct an origin verification pursuant to 19 C.F.R. § 181.71 before denying Plaintiff's goods NAFTA preferential treatment. Thus, Defendant moved for remand to allow it to cure the procedural error. This Court granted Defendant's Motion for Remand on April 22, 1997, and Customs conducted the verification. Upon completion of the verification, Customs again determined that Plaintiff's crankshafts did not qualify as originating goods under General Note 12(b)(ii), HTSUS. Therefore, this action resumed.

In the second count of its amended complaint, Plaintiff claims, "In the absence of a timely origin verification, 19 C.F.R. § 181.71 requires that Customs liquidate merchandise claimed as NAFTA originating at the NAFTA rate of duty." Pl.'s Second Am. Compl. ¶ 30. Moving for summary judgment, Defendant counters that NAFTA verification conducted after commencement of this action does not entitle the imported crankshafts to duty-free entry as a matter of law. See Mem. in Supp. of Def.'s Mot. for SJ at 21. Because Plaintiff does not controvert any of the material facts set forth by Defendant, this Court finds that it is appropriate to resolve this issue by summary judgment. See USCIT Rule 56(i).

"As a general rule, an agency is required to comply with its own regulations." Kemira Fibres OY v. United States, 61 F.3d 866,

871 (Fed. Cir. 1995).  Here, however, neither the statute nor the regulation specifies the consequence of noncompliance.  Therefore, this Court must decide whether Customs' failure to conduct a timely origin verification automatically affords the subject imports NAFTA preferential treatment.

"There is no question that when a government agency acts 'without observance of procedure required by law,' courts have the power to set aside that action."  Sea-Land Service, Inc. v. United States, 14 CIT 253, 257, 735 F. Supp. 1059, 1063 (1990)(citations omitted), aff'd, 923 F.2d 838 (Fed. Cir. 1991).  In reviewing an agency's procedural error for which the law does not prescribe a consequence, however, it is well settled that principles of harmless error apply.  See Intercargo Ins. Co. v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996).  The judicial review section of the Administrative Procedure Act, 5 U.S.C. § 706 (1994), instructs that, in reviewing an agency's procedural actions, "'due account shall be taken of the rule of prejudicial error.'" Id. (citing 5 U.S.C. § 706).  Under the rule of prejudicial error, or harmless error analysis, the Court will not overturn an agency's action "if the procedural error complained of was harmless."  Barnhart v. United States, 7 CIT 295, 302, 588 F. Supp. 1432, 1437 (1984). "The burden to demonstrate prejudicial error is on the party

claiming the error was prejudicial."  Id.; see also Kemira Fibres, 61 F.3d at 875.

Plaintiff, however, does not allege that it was prejudiced by Customs' failure to conduct a timely origin verification.  Rather, Plaintiff raises three policy arguments as to why Defendant's procedural error should automatically render its denial of NAFTA preferential treatment void.  Plaintiff argues that, if this Court does not void Customs' denial of duty-free treatment: (1) 19 C.F.R. § 181.71 would no longer have the force and effect of law; (2) there would likely be reciprocal non-enforcement of the provision by Canada and Mexico; and (3) judicial efficiency would be impeded because NAFTA claimants would have to bring court actions to make Customs conduct origin verifications.  See Pl.'s Mem. in Opp'n to Def.'s Mot. for SJ at 22.

Although this Court is mindful of Plaintiff's justifiable concerns, the Court will not overturn Customs' action without a showing that Plaintiff was prejudiced by Customs' procedural error in this case.  See NLRB v. Seine & Line Fishermen's Union, 374 F.2d 974, 981 (9th Cir. 1967)(explaining that each case must be determined on its individual facts and, if errors are deemed minor, administrative orders should remain in force notwithstanding).  The Court does not condone Customs' failure to conduct a timely origin

verification.    Nevertheless, because Plaintiff is unable to demonstrate that it was harmed, the Court will not void Customs' finding that the crankshafts were not NAFTA originating goods within the meaning of General Note 12(b)(ii), HTSUS.  In any event, the circumstances of this case indicate that Plaintiff was not actually prejudiced.

"Prejudice, [for purposes of harmless error analysis], means injury to an interest that the statute, regulation[,] or rule in question was designed to protect."  Intercargo, 83 F.3d at 396.  A review of the NAFTA Agreement and its legislative history indicates that a primary purpose of the origin verification is to afford the importer notice prior to liquidation as to whether its imports would qualify as NAFTA originating goods.  See NAFTA Agreement, Article 506 ¶ 11, reprinted in 1 North American Free Trade Agreements: Treaty Materials Booklet 3 (James R. Holbein and Donald J. Musch eds., 1994)("NAFTA: Treaty Materials"); NAFTA Statement of Administrative Action ("NAFTA SAA") at 49 ("A determination by the customs authorities of the importing country that particular goods do not meet NAFTA's rules of origin . . . does not become effective until those authorities notify in writing both the importer and the person that completed the certificate of origin."), reprinted in 1 NAFTA: Treaty Materials Booklet 8; Uniform Regulations for the

Interpretation, Application, and Administration of Chapters Three and Five of the NAFTA ("Uniform Regulations"), Article VI ¶¶ 19 & 20, reprinted in 2 NAFTA: Treaty Materials Booklet 29.  In addition, NAFTA affords the importer the right to administrative and judicial review of determinations resulting from origin verifications.  See NAFTA Agreement, Article 510; NAFTA SAA at 51-52; Uniform Regulations, Article VIII.

Here, although Customs did not conduct an origin verification prior to denying Plaintiff's goods preferential treatment, it did review and determine whether the goods qualified as NAFTA originating goods in its advance ruling, NY 811617 (July 27, 1995), prior to liquidation.  An advance ruling may address "[w]hether a good qualifies as an originating good under General Note 12, HTSUS[.]"  19 C.F.R. § 181.92(6)(v).  Customs issued the advance ruling on July 27, 1995, and liquidated Plaintiff's imports the following September, October, and November.  Thus, prior to liquidation, Plaintiff had notice as to how Customs would treat its imports.  See 19 C.F.R. § 181.100(a)(1) & (a)(2)(ii) ("An advance ruling letter issued by Customs . . . represents the official position of Customs with respect to the particular transaction or issue described therein and is binding" with respect to both the subject articles and all identical articles.).  Finally, an

importer has the right to administrative and judicial review of an advance ruling.  See 19 C.F.R. § 181.102.  Therefore, although Customs did not conduct a timely origin verification, it did determine whether Plaintiff's crankshafts qualified as NAFTA originating goods in a manner that afforded Plaintiff both timely notice and the right to judicial review.  These circumstances indicate that Plaintiff was not prejudiced.

Second, Customs on its own recognized the procedural error and, upon voluntary remand, conducted a complete origin verification pursuant to 19 C.F.R. § 181.72.  In so doing, Customs acknowledged that it would reverse its earlier position if it found that Plaintiff's goods indeed qualified as originating in a NAFTA territory.  Therefore, although Customs did not conduct the verification until after the commencement of this action, it *sua sponte* recognized the problem and remedied it, affording Plaintiff a meaningful verification.  Because Plaintiff itself did not recognize the procedural error, and the eventual verification merely confirmed Customs' earlier finding, it is difficult to see how Plaintiff could have been prejudiced.

In sum, Plaintiff fails to demonstrate how it was prejudiced by Customs' failure to conduct a timely origin verification, and the circumstances of this case indicate that Plaintiff was indeed

not prejudiced.  Therefore, applying the harmless error analysis, this Court will not void Customs' liquidation of the crankshafts as non-originating under NAFTA.  The Court grants Defendant's motion for summary judgment on this issue.


III.  **The Substantial Transformation Test**

The marking provision, 19 U.S.C. § 1304 (1994), requires that imports into the United States be conspicuously marked with the name of their "country of origin."  Where, as here, an article is not completely manufactured in one country, "[f]urther work or material added to an article in [the other country] must effect a substantial transformation in order to render such other country the 'country of origin'" within the meaning of 19 U.S.C. § 1304. 19 C.F.R. § 134.1(b)(1995).  In <u>United States v. Gibson-Thomsen Co., Inc.</u>, 27 C.C.P.A. 267 (1940), the predecessor to the Court of Appeals for the Federal Circuit held that a product undergoes a "substantial transformation" if, as a result of further manufacturing or processing, the product loses its identity and is transformed into a new product having "a new name, character[,] and use."  27 C.C.P.A. at 273 (the substantial transformation test or <u>Gibson-Thomsen</u> test).

In Count III of its complaint, Plaintiff alleged, "Having

undergone a substantial transformation in Mexico, the crankshafts are products of Mexico for purposes of the assessment of duty and within the meaning of 19 U.S.C. § 1304."  Pl.'s Second Am. Compl. ¶ 36.  Thus, despite the requirement of a tariff shift under General Note 12(b)(ii), HTSUS, Plaintiff argues that the substantial transformation test requires a finding that Mexico is the country of origin of the subject crankshafts for purposes of marking, thereby affording them NAFTA duty preference.  See id. ¶ 37.

Moving for summary judgment, Defendant contends that the issue of whether the imported crankshafts were substantially transformed in Mexico is irrelevant as a matter of law.  See Mem. in Supp. of Def.'s Mot. for SJ at 28.  Moreover, Defendant argues that the Court lacks subject matter jurisdiction to hear the marking issue: "It is black letter law that in the absence of an assessment of marking duties, or the exclusion or demand for redelivery of goods due to improper marking, none of which occurred here, the question of how imported goods should be marked is not a protestable issue under 19 U.S.C. § 1514."  Def.'s Reply at 28.  The Court, however, does not need to address the jurisdictional question because it is clear that, regardless, the substantial transformation test is irrelevant to whether Mexico is the country of origin of the

imported crankshafts as a matter of law.

First, the Court notes that the country of origin determination for marking purposes under 19 U.S.C. § 1304 is distinct from the determination of whether a good is a NAFTA originating good under General Note 12(b)(ii), HTSUS. See Alcan Aluminum Corp. v. United States, 165 F.3d 898, 901-02 (1999)(holding that the substantial transformation test was not relevant as to whether a good originated in Canada for the purposes of the United States-Canada Free Trade Agreement under General Note 3(c)(vii)(B)(2), HTSUS (1993)); see also General Note 12(b)(ii), HTSUS (1995).

Second, for the purpose of determining whether a good should be marked with a NAFTA territory as the country of origin, the NAFTA Marking Rules have displaced the substantial transformation test. The regulations at 19 C.F.R. § 134.1(b) provide that, "for a good of a NAFTA country, the NAFTA Marking Rules will determine the country of origin." "The 'NAFTA Marking Rules' are the rules promulgated for purposes of determining whether a good is a good of a NAFTA country." 19 C.F.R. § 134.1(j). The Secretary of the Treasury promulgated the NAFTA Marking Rules to be applied in the United States at 19 C.F.R. Part 102. Section 102.11 states that, where a good is not wholly produced in one country, "[t]he country

of origin of [the] good is the country in which . . . [e]ach foreign material incorporated in that good undergoes an applicable change in tariff classification set out in § 102.20[.]" 19 C.F.R. § 102.11(a)(3)(1995). The NAFTA Marking Rules do not mention the substantial transformation test in instructing how to determine the country of origin.

The statute expressly directs that the NAFTA Marking Rules be employed in determining whether to accord goods NAFTA preferential duty treatment. See General Note 12(a)(ii), HTSUS ("Goods that originate in the territory of a NAFTA party . . . and that qualify to be marked as goods of Mexico under the terms of the marking rules as set forth in regulations issued by the Secretary of the Treasury . . . are eligible for [NAFTA] duty rate[.]"). Therefore, the statute authorizes the use of the tariff shift test, instead of the substantial transformation test, for goods not wholly produced in one country. Moreover, Plaintiff has failed to distinguish this case from the circumstances underlying the Federal Circuit's holding in Bestfoods v. United States, 165 F.3d 1371, 1375-76 (Fed. Cir. 1999), cert. denied, 120 S. Ct. 42 (1999)(holding that it was valid for the Secretary of the Treasury "to adopt a construction of the federal marking statute, for NAFTA goods, that was based on the tariff-shift approach instead of the Gibson-Thomsen approach[]").

Therefore, because the substantial transformation test is irrelevant to the determination of whether Mexico is the country of origin of the crankshafts as a matter of law, the Court grants Defendant's motion for summary judgment on this issue.

## Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is granted.

_____

Donald C. Pogue
Judge

Dated:     December 21, 1999
           New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

CUMMINS ENGINE COMPANY,

        Plaintiff,

    v.

UNITED STATES,

        Defendant,

Before: Pogue, Judge
Court No. 96-04-01274

**<u>Judgment</u>**

This action has been duly submitted for decision, and this court, after due deliberation, has rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that Defendant's motion for summary judgment is granted and final judgment is entered for Defendant.

                               Donald C. Pogue
                                  Judge

Dated:    December 21, 1999
           New York, New York