**Slip Op. 03-93**

## UNITED STATES COURT OF INTERNATIONAL TRADE

---

DANIEL ATTEBERRY,

        *Plaintiff,*

    v.

UNITED STATES,

        *Defendant.*

:
:
:
:
:
:
:
:

Court No. 02-00647

---

[Defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 2637(a) denied.]

Dated: July 28, 2003

Daniel Atteberry, Plaintiff *Pro Se*.

Peter D. Keisler, Assistant Attorney General; John J. Mahon, Acting Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jack S. Rockafellow); Yelena Slepak, Office of Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, United States Department of Homeland Security, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

The United States ("Government") has moved to dismiss for lack of subject matter

jurisdiction this action in which *pro se* plaintiff Daniel Atteberry contests the decision of the United

States Customs Service ("Customs")[1] re-classifying for tariff purposes certain merchandise which he describes as "bike[s]/kart[s]/scooter[s]." Specifically, the Government contends that this action is barred by 28 U.S.C § 2637(a) (2000),[2] which authorizes a civil action challenging Customs' denial of a protest "only if all liquidated duties, charges, or exactions have been paid at the time the [civil] action is commenced." *See* Memorandum in Support of Defendant's Motion to Dismiss Plaintiff's Action for Lack of Subject Matter Jurisdiction ("Def.'s Brief") at 7-8; Defendant's Memorandum in Response to "Plaintiff's Motion for Summary Judgment and for Denial of Defendant's Motion to Dismiss" ("Def.'s Reply Brief") at 4-7.

However, as discussed in greater detail below, Customs failed to bill Mr. Atteberry for the outstanding duties and interest, in flagrant violation of its own regulations. Indeed, although the agency was on notice of his current mailing address as of April 2002 – and, in fact, mailed its Notice of Denial of his protest to him at that address – Customs failed to send Mr. Atteberry even a single bill at that (or, for that matter, any other) address at any point in the critical 180-day period that followed, during which Mr. Atteberry would have had to act to perfect jurisdiction before this Court.

Because 28 U.S.C. § 2637(a) plainly contemplates that an importer is on notice of the sum due, and because Customs' failure to render monthly bills – in violation of its own regulations – deprived Mr. Atteberry of that notice, the Government's motion to dismiss for lack of subject matter

---

[1]Effective March 1, 2003, the Customs Service was renamed the Bureau of Customs and Border Protection of the United States Department of Homeland Security. *See Reorganization Plan Modification for the Department of Homeland Security*, H.R. Doc. 108-32, at 4 (2003).

[2]Unless otherwise indicated, all statutory references are to the 2000 version of the United States Code.

jurisdiction pursuant to 28 U.S.C. §2637(a) must be denied.

## I.  Background

### A.  Overview of the Statutory and Regulatory Framework

All goods imported into the United States are subject to duty or duty-free entry depending upon, *inter alia*, their classification under the Harmonized Tariff Schedule of the United States. Commercial importers are required to specify the classification and valuation of merchandise when an entry is filed.  Thus, classification is initially the responsibility of the importer, customs broker or other person preparing the entry papers.[3]

Customs makes its determination on the dutiable status of imported merchandise when the entry is "liquidated,"[4] after the agency has reviewed the entry papers and any other relevant documentation.  Even though the merchandise itself may be released to the custody of the importer before Customs' review is complete, the importer's financial liability for the entry is not determined until liquidation is complete.  Generally, Customs must complete liquidation within one year from

---

[3]Much of this general discussion is taken from a publication of the U.S. Customs Service, Importing Into the United States: A Guide for Commercial Importers (Nov. 1998) at 12-15, 28-30, 46-47.

[4]Customs regulations define "liquidation" as "the final computation or ascertainment of the duties . . . accruing on an entry."  19 C.F.R. § 159.1 (2001).

Unless otherwise indicated, all references to regulations are to the 2001 version of the Code of Federal Regulations, the relevant provisions of which were in place (or substantively identical to provisions in place) throughout the relevant period.

the date of entry.[5]  During that time, Customs may seek additional information about the entry – for example, through a Request for Information.

If Customs makes a preliminary determination that an entry cannot be liquidated as entered (for example, because the classification on the entry papers appears to be incorrect), and if that change would result in the imposition of a higher rate of duty, Customs notifies the importer (or the importer's broker or other designee) of the proposed duty rate advancement.  The importer then has an opportunity to validate its claimed classification.  If the importer fails to respond to the notice, or if Customs is not persuaded by the response, the entry is liquidated in accordance with Customs' determination.  Under Customs regulations, official notice of the liquidation is accomplished through the "bulletin notice" which is "posted" or "lodged" for the information of importers in the customhouse at the port of entry.  19 C.F.R. § 159.9(a)-(b).

The bulletin notice performs a critical notice function by giving the importer (at least constructive) notice of the fact of the liquidation of its merchandise, and starting the 90-day "clock" for the filing of a "protest" with Customs (as further discussed below).[6]  But, significantly, the

---

[5]*See* 19 U.S.C. § 1504(a).  That deadline is subject to certain exceptions not relevant here. *See generally* Intercargo Ins. Co. v. United States, 83 F.3d 391, 392-93 (Fed. Cir. 1996).

[6]Importers thus must monitor bulletin postings at the customhouse to ensure their ability to file timely administrative protests of adverse determinations (such as duty rate increases) by Customs.  *See*, *e.g.*, Goldhofer Fahrzeugwerk GmbH & Co. v. United States, 13 CIT 54, 58, 706 F. Supp. 892, 895, *aff'd*, 885 F.2d 858 (Fed. Cir. 1989).

In addition to "bulletin notice," Customs regulations further provide that the agency "will endeavor to provide importers" with "Courtesy Notice" of entries "scheduled to be liquidated."  It is the bulletin notice which is the legally significant notice, however.  As the regulations clearly state, the courtesy notice merely "serve[s] as an informal, courtesy notice and not as a direct, formal, and decisive notice of liquidation."  19 C.F.R. § 159.9(d).  *See also* Goldhofer, 885 F.2d at 860.

bulletin notice *does not* specify the duty rate at which the goods were liquidated (other than to indicate whether the goods were liquidated at an "increase"). Nor does the bulletin notice otherwise specify the amount of duties and interest outstanding.[7] That information is provided to the importer only through Customs' billing process.

Customs regulations require that the agency bill an importer for outstanding duties and accrued interest not only at the time of liquidation, but also "*every 30 days after the due date*" – with the "due date" defined as "30 days [after] the date of issuance of the bill" – "*until the bill is paid or otherwise closed*." 19 C.F.R. § 24.3a(d)(1) (emphasis added); 19 C.F.R. § 24.3(e). The regulations specify in some detail the content of bills,[8] including:

(i) Principal amount due;
(ii) *Interest computation date*;
(iii) Late payment date;
(iv) *Accrual of interest charges if payment is not received by the late payment date*;
(v) *Applicable current interest rate*;
(vi) *Amount of interest owed*;
(vii) Customs office where . . . billing errors may be addressed; and

---

[7]Defendant's Attachment 22 is a copy of the bulletin notice in this case. Note that it indicates simply that the merchandise at issue has been liquidated at an unspecified "INCREASE." *See also* Letter Memorandum from Counsel for Defendant to Court, dated June 12, 2003 ("Def.'s Letter Memo") ¶ 22 (conceding that, while bulletin notice gives notice of the fact of liquidation and of the fact of any increase, it does not give notice of the *amount* of the increase).

[8]Defendant's Attachment 18 is a somewhat illegible copy of the initial bill sent by Customs in this action (which, as discussed below, was never received by Mr. Atteberry).

Pursuant to 19 C.F.R. § 24.3a(d)(2), Customs also "report[s] outstanding bills on a Formal Demand on Surety for Payment of Delinquent Amounts Due, for bills more than 30 days past due (approximately 60 days after bill due date), and every month thereafter until the bill is paid or otherwise closed." Defendant's Attachment 20 includes copies of 10 such demands sent to Mr. Atteberry's surety – which include essentially the same information as the bills sent to importers – covering the period up through the commencement of this action.

(viii) Transaction identification (e.g., entry number . . .).

19 C.F.R. § 24.3a(d)(1) (emphases added).

As a general rule, interest assessed due to an underpayment of duties accrues "from the date

the importer of record is required to deposit estimated duties, taxes, fees, and interest to the date of

liquidation."  19 C.F.R. § 24.3a(b)(2)(i).  If the supplemental duties and interest are not paid in full

within 30 days of the date of issuance of Customs' initial bill, interest continues to accrue on the

unpaid balance until it is paid in full.  19 C.F.R. § 24.3a(b)(2)(ii).  The applicable rate of interest

varies over time, and is pegged to "the semiannual rate(s) established under [specified sections] of

the Internal Revenue Code."  19 C.F.R. § 24.3a(c)(1).[9]  The computation of interest is thus a

somewhat less-than-straightforward exercise[10] – which is no doubt why the regulation specifying the

---

[9]*See*, *e.g.*, Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties, 68 Fed. Reg. 40,279 (July 7, 2003).

[10]Indeed, it appears that there is some confusion on the part of the Government here as to the amount of the outstanding duties and accrued interest owed at various points in time.

In its opening brief, the Government asserted that Customs' initial bill, dated October 19, 2001, was for the sum of $542.11.  *See* Def.'s Brief at 2.  Although Defendant's Attachment 18 (a copy of that initial bill) is not legible, the 10 Formal Demands on Surety included in Defendant's Attachment 20 – as well as the Bill Number Query attached to Defendant's Declaration of Karen P. Binder – all indicate that the principal at issue (i.e., the supplemental duties) total $507.42.  Moreover, the first Formal Demand on Surety included in Attachment 20 shows a "Run Date" of "02/05/02," and reflects the accrual of $5.87 in interest, for a total due of $513.29.  If the total balance due in February 2002 was only $513.29, the initial bill – dated October 19, 2001 (some months earlier) – could not possibly have totaled $542.11.

The last of the 10 Formal Demands on Surety included in Defendant's Attachment 20 shows a "Run Date" of "11/2/02," and reflects the accrual of $32.02 in interest, for a total balance due of $539.44 as of that date.  The Bill Number Query attached to the Binder Declaration appears to be dated "12/09/02" – a little more than a month after the tenth Formal Demand on Surety – and reflects the accrual of $34.69 in interest on the principal of $507.42, for a total balance of $542.11 as of that

content of bills addresses interest in such detail. Similarly, so that an importer can rely on its most recent monthly bill to know the precise sum required to pay off its obligation in full, Customs regulations essentially "freeze" interest "for the 30-day period in which . . . payment is actually received at the 'Send Payment To' location designated on the bill." 19 C.F.R. § 24.3a(c)(3).

Although Customs' determination of dutiable status is final for most purposes at the time of liquidation, an importer has the right to challenge Customs' determination, provided that the importer files a "protest" with the agency within 90 days of "[t]he date of [bulletin] notice of liquidation." 19 U.S.C. § 1514 (c)(2); 19 C.F.R. § 174.12(e)(1). Significantly, an importer is not required to pay the outstanding duties and interest in dispute in order to pursue the protest process within Customs. A liquidation is not final until any protest which has been filed against it has been decided by the agency.

Similarly, Customs' denial of a protest is not final until any litigation challenging that determination has become final. An importer is entitled to challenge Customs' denial of its protest in this Court, provided that the importer does two things to "perfect" jurisdiction. Like so much of life, it boils down to a matter of *time* and *money*. Specifically, 28 U.S.C. § 2636(a)(1) – the "time" requirement – mandates that the importer must commence its action by filing a summons with the Court "within [180] days after the date of mailing of [Customs'] notice of denial of [the] protest."

---

date.

In short, it appears that – contrary to the Government's representations – not only was $542.11 not the total amount due as shown on the initial (October 19, 2001) bill sent to (albeit not received by) Mr. Atteberry, it also was not the amount due as of October 7, 2002, the date this action was commenced.

 In addition, 28 U.S.C § 2637(a) – the "money" requirement –  requires that the importer pay the

outstanding duties and interest *before* the action is commenced.[11]  Moreover, the sum owed must be

paid to the very last penny.  There is zero margin for error, and no exceptions – not even "for

nominal amounts left unpaid at the time the summons is filed."[12]

Reading the two provisions – § 2636(a)(1) and § 2637(a) – in concert, it is thus clear that,

for an importer wishing to seek judicial review of Customs' denial of a protest, the 180-day period

following Customs' mailing of the notice of denial of protest is critical.  Within that period, the

importer must (1) pay any duties and interest that remain outstanding, and then (2) file a summons

with this Court.

## B.  The Facts of This Case

The facts of this case are relatively straightforward, and not in dispute.  In late May 2001, a

shipment of "bike[s]/kart[s]/scooter[s]" from the Netherlands was entered duty-free through the port

of Seattle by plaintiff importer, Daniel Atteberry.[13]  Mr. Atteberry is a relative novice at importing,

with only one prior experience, in October 1999 – when, importing apparently the same type of

---

[11]It is worth noting that the Customs publication, Importing Into the United States, refers specifically only to the 180-day requirement, and does not identify payment of outstanding duties and interest as a prerequisite for litigation.  Importing Into the United States, at 47 ("If a protest is denied, an importer has the right to litigate the matter by filing a summons with the U.S. Court of International Trade within 180 days after denial of the protest.  The rules of the court and other applicable statutes and precedents determine the course of customs litigation.").

[12]Penrod Drilling Co. v. United States, 13 CIT 1005, 1008, 727 F. Supp. 1463, 1466 (1989), *aff'd*, 925 F.2d 406 (Fed. Cir. 1991).

[13]*See* Defendant's  Statement of  Undisputed Material Facts  ("Def.'s Statement of Facts") ¶ 1; Plaintiff's Statement of Undisputed Material Facts ("Pl.'s Statement of Facts") ¶ 1.

merchandise (albeit through a different port), the goods were liquidated as entered, duty-free.[14] Thus,

before the events that gave rise to this case, Mr. Atteberry had no prior experience with Customs'

protest process, and no experience with filing an action in this Court to challenge Customs' denial

of a protest.[15]

---

[14]*See* Letter from Plaintiff to Commissioner of Customs, dated December 20, 2001 ("Protest"). As a general rule, classification determinations do not have *res judicata* effect. *See generally* United States v. Stone & Downer Co., 274 U.S. 225, 235-36 (1927).

[15]The Government implies that Mr. Atteberry is a seasoned importer, emphasizing that "as indicated in his protest . . . , the entry subject to this court action is not the first importation made by Mr. Atteberry. By his own admission he imported before, albeit through a different port of entry." Def.'s Letter Memo ¶ 22. However, as explained above, Mr. Atteberry's prior experience with importing is limited to a single occasion – and one which gave him no exposure to Customs' protest process, or to the processes of litigation in this forum.

Similarly, the Government emphasizes that Mr. Atteberry is a "commercial importer[ ]," who "imported for purposes of resale and/or rent of the merchandise, not for his own use." *Id*. Again, the implication may be misleading. His business ventures have not been a gold mine, to say the least. *See* Letter from Plaintiff to Court, dated Oct. 3, 2002 ("Complaint") (explaining that he gave away most of the scooters "because [he] could not sell them"); Protest (stating that he has "sold or given away 55 bikes in two years").

As his various representations indicate, and as his Motion for Leave to Proceed In Forma Pauperis confirms, Mr. Atteberry is a man of extremely modest means. The record belies any attempt to portray him as a major commercial importer. *See also* Complaint ("I am next to homeless if not homeless. People let me stay at different houses. I have a business if you want to call it that, making under . . . 1000 dollars a month and living on borrowed money . . . .").

Whatever allowances Customs may or may not make for "small-time" or "relative novice" importers (and whatever accommodations the agency may or may not have made at the administrative level in this case), the standard in this forum is clear. Mr. Atteberry's appointed counsel has withdrawn, and he is now proceeding *pro se.* "Implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training. While the right 'does not exempt a party from compliance with relevant rules of procedural and substantive law,' Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981), it should not be impaired by harsh application of technical rules. Trial courts have been directed to read *pro se* papers liberally, Haines v. Kerner, 404

Based on the relatively smooth sailing that he enjoyed the first time he sought to navigate the

waters of importing, Mr. Atteberry was apparently somewhat taken aback when Customs raised

various questions concerning this second entry of the same type of merchandise.[16] He nevertheless

responded promptly to Customs' two Requests for Information, which were conveyed to him through

his broker. On his responses, Mr. Atteberry printed his telephone number in the appropriate box on

the Customs form.[17]

In late August 2001, Import Specialist Diana May of Customs in Seattle telephoned Mr.

Atteberry, requesting certain additional information, which he supplied in a letter to her several days

later, expressing his "concern[ ] . . . at [Customs'] plan[s] to reclassify" his merchandise.[18] By

Notice of Action dated September 5, 2001, signed by Ms. May and mailed to his Kenmore,

---

U.S. at 520 . . . ." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983). *See also* Forshey v. Principi, 284 F.3d 1335, 1357-58 (Fed. Cir. 2002).

[16]*See*, *e.g.*, Protest (arguing that Customs' imposition of duties on merchandise previously liquidated as duty-free "is a changing of the rules in the middle of the game").

[17]*See* Customs Request for Information, dated June 21, 2001; Fax Memo from Robert Erwin of Landweer & Co., Inc. to Pedal Pedal GoKarts – Attention: Danny, dated June 25, 2001 (transmitting Request for Information dated June 21, 2001); Mr. Atteberry's response to Customs June 21, 2001 Request for Information, dated June 28, 2001; Customs Request for Information, dated July 17, 2001; Fax Memo from Robert Erwin of Landweer & Co., Inc. to PedalPedal Gokarts – Attention: Danny, dated July 27, 2001 (transmitting Request for Information dated July 17, 2001); Mr. Atteberry's response to Customs July 17, 2001 Request for Information, dated August 17, 2001; Plaintiff's Response to Defendant's Memorandum in Response to Motion for Summary Judgment and Denial of Defendant's Motion to Dismiss ("Pl.'s Reply Brief") at 2 (noting that when "Customs was seeking information on the entry [ ] they sent their inquiries to [Mr. Atteberry's] broker, to be sent on to [him]").

[18]*See* Letter from Plaintiff to Diana May, dated Aug. 30, 2001 (referring to her "phone call of Aug 28, requesting additional information").

Washington address, Customs formally notified Mr. Atteberry of its proposed reclassification of his merchandise, which would result in a "rate advance" (effectively assessing duties on merchandise which he had entered duty-free). That "Notice of Proposed Rate Advance" advised that the rate advance would take effect "unless [Mr. Atteberry could] show proof to substantiate [his] claim that these bikes are designed for children within 20 days (09/25/01)" from the date of the Notice.[19]

Further telephone communications between Customs and Mr. Atteberry ensued. Following up on one such phone conversation, Christine Furgason, of Customs' "HQ Reconciliation Team" in Washington, D.C., sent an electronic mail ("e-mail") message to Mr. Atteberry at his e-mail address (pedalpedalgokarts@juno.com), acknowledging their conversation and "recommending that [his] response to Seattle's CF29 (Notice of Action), dated September 5, 2001 [the Notice of Proposed Rate Advance] be faxed to CST#789s' attention," at a fax number which Ms. Furgason supplied in her e-mail message.[20] Ms. Furgason's e-mail message also provided her own e-mail address, as well as her telephone and fax numbers.

Mr. Atteberry filed a timely response to the Notice of Proposed Rate Advance,[21] but to no avail. By Notice of Action dated September 25, 2001 ("Notice of Rate Advance"), signed by Ms.

---

[19]The reference in the Notice of Proposed Rate Advance to Mr. Atteberry's "letter dated August 31, 2001" appears to be a reference to his letter of August 30, 2001.

[20]*See* E-mail message from Christine Furgason to Plaintiff, dated "Tue, 18 Sep 2001 10:53:38." Mr. Atteberry had previously provided his e-mail address to Customs in the course of various communications with agency personnel. *See* Plaintiff's Response to Judge Delissa A. Ridgway, dated May 31, 2003 ("Pl.'s Letter Memo I") ¶¶ 15-17.

[21]Letter from Plaintiff to Ms. May, undated, apparently sent on September 25, 2001. *See* Notice of Action dated September 25, 2001 ("Notice of Rate Advance") (referring to Plaintiff's "letter dated September 25, 2001, in response to [Customs' Notice of Proposed Rate Advance]").

May and mailed to his Kenmore, Washington address, Customs formally notified Mr. Atteberry that

it had taken "rate advance" action on his merchandise "as proposed," which "will result in an

increase in duties." That Notice further advised that "[t]he entry is in the liquidation process and is

not available for review in this office." The last line of the Notice stated, "As you requested, a copy

of the Customs Regulations covering Administrative Protests is included for your convenience."

Like the Notice of Proposed Rate Advance, the Notice of Rate Advance was signed by Ms. May and

included her telephone number.

A couple of weeks later, in mid-October 2001, Mr. Atteberry vacated the Kenmore,

Washington address.[22] His next contact with Customs was on December 20, 2001, when he filed

a timely Protest of Customs' action. His letter of Protest – dated December 20, 2001 and addressed

to the "Commissioner of Customs" in Seattle – advised the agency that he had "No [mailing]

Address at present" and provided his e-mail address (the same e-mail address that Customs had used

to contact him several months before, in September 2001: pedalpedalgokarts@juno.com).

In the meantime, Customs had liquidated Mr. Atteberry's merchandise.[23] At about the same

---

[22]*See* Pl.'s Letter Memo I ¶ 14 (noting that Mr. Atteberry left the Kenmore, Washington address "on/before Oct 15, 2001"). Mr. Atteberry has explained that he did not file an official change of address form at that time with either the U.S. Postal Service or Customs because he "didn't owe any bills or expect mail from anyone," although he did take his mailbox with him so that "the postman would know [he] was gone." *Id*. Based on the Notice of Rate Advance, Mr. Atteberry "did not expect anything further from Customs" and understood that "the next move was [his], the appeal 12-20-01." Plaintiff's Response to Judge Delissa A. Ridgway, undated, served June 6, 2003 ("Pl.'s Letter Memo II") at 1. As discussed above, his Protest dated December 20, 2001 notified Customs that he had no mailing address at that time.

[23]*See* Def.'s Statement of Facts ¶ 6 ("On or about October 19, 2001, the subject Entry was liquidated."); Pl.'s Statement of Facts ¶ 6 (same); Def.'s Att. 22 (Bulletin Notice of Entries Liquidated/Liquidation Date 10/19/01).

time, Customs first billed Mr. Atteberry for the duties and interest assessed as a result of the rate advance. That bill – dated October 19, 2001 and sent to the Kenmore, Washington address – never reached Mr. Atteberry, who had moved from the address only days before.[24] Indeed, that bill was returned to Customs (in Atlanta) as undeliverable on December 26, 2001 – the very same day on which Customs (in Seattle) received Mr. Atteberry's Protest, which also advised that he was no longer at the Kenmore address but could still be reached via e-mail.[25] Customs nevertheless continued, for some time, to bill Mr. Atteberry at the Kenmore address. Apparently, a total of four bills were sent to that address – the last on February 3, 2002. Then, abruptly, billing stopped. Mr. Atteberry never received any of the four bills sent to the Kenmore address; and, to this day, Customs has never billed Mr. Atteberry for the outstanding duties and interest at any other address.[26]

---

The record is silent as to whether Mr. Atteberry ever actually saw the bulletin notice for his entry (Defendant's Attachment 22); presumably he did not. The record is also silent as to whether Customs sent him a courtesy notice of liquidation and, if it did, what became of that notice. In any event, neither the bulletin notice nor the courtesy notice is significant in this case because, as discussed in section I.A above, those notices do not specify the amount of duties and interest outstanding. That information is provided to an importer only through Customs' billing process.

[24]See Def.'s Att. 18 (Customs bill dated "10-19-01"); Def.'s Letter Memo ¶ 19 (indicating that bill "was sent on or about October 21, 2001").

[25]See Def.'s Att. 18 (Customs bill envelope date-stamped "U.S. Customs Service, 2001 Dec 26 A 10:23); Def.'s Statement of Facts ¶ 11 (Customs received Protest on December 26, 2001); Pl.'s Statement of Facts ¶ 10 (same). When it was returned to Customs, there was a handwritten notation on the envelope in which the bill was enclosed: "not @ this address." There is no indication in the record who made that notation. Nor is there any indication where the October 2001 bill languished for more than two months – between October 21, 2001 (when it was assertedly mailed) and December 26, 2001 (when it was returned to Customs), or what became of the other three bills that were sent to the Kenmore address. Def.'s Letter Memo ¶ 19.

[26]Def.'s Letter Memo ¶ 19 (indicating that Customs sent "a total of four bills . . . to Mr. Atteberry" at the Kenmore address, "the last bill . . . on February 3, 2002"); Pl.'s Letter Memo I ¶

On April 3, 2002, Customs denied Mr. Atteberry's Protest. That same day, Jeannine

Delgado, an Entry Specialist with Customs in Seattle, sent Mr. Atteberry an e-mail message at the

e-mail address he had provided on his Protest. Ms. Delgado informed Mr. Atteberry that a decision

had been reached on the Protest, and that Customs regulations require that copies of such decisions

be delivered via U.S. Mail. She therefore requested that Mr. Atteberry provide her with his "current

mailing address." Mr. Atteberry responded via e-mail, and Customs' decision on the Protest was

dispatched to him via U.S. Mail on April 9, 2003, at the "current mailing address" he provided to

Customs, in Vashon, Washington.[27]

_____

1 ("I was never asked by Customs to pay any duties . . . . I never received a Bill"). Although the record gives no indication why Customs stopped billing Mr. Atteberry (and although the reason is immaterial), it seems likely that some Customs official made the decision to stop the billing based on the fact that the October 2001 bill had been returned to the agency unopened. The wisdom of that decision is discussed below. *See* n.33, *infra*.

[27]*See* E-mail message from Jeannine Delgado to Plaintiff (at pedalpedalgokarts@juno.com), dated "Wed, 3 Apr 2002 18:10:24"; Def.'s Letter Memo ¶ 23 ("[A]n entry specialist at the port responsible for mailing notices of denials of protests to importers sent Mr. Atteberry an e-mail on April 3, 2002 requesting his address for the purpose of sending him Customs' decision on his protest. This was done because 'no address at present' was listed as the return address on the protest. Therefore, the denial was sent to Mr. Atteberry at the address provided by him to Customs via e-mail."); Def.'s Att. 18 (handwritten address on Customs envelope, postmarked in Seattle on April 9, 2003 and addressed to Mr. Atteberry).

It is worth noting that – just as the Government initially contended that the Notice of Denial of Protest in this action was mailed on April 3, 2002, and the postmark was later found to be April 9, 2002 (*see* Atteberry I) – so too the Government initially asserted that Customs' Notice of Denial was mailed to Mr. Atteberry at the *Kenmore* address, though it now concedes that the notice was in fact mailed to the *Vashon* address. *Compare* Def.'s Statement of Facts ¶¶ 1 (asserting that Kenmore address is "address of record"), 13 (asserting that "[t]he Denial was mailed to plaintiff at his address of record") *with* Def.'s Letter Memo ¶ 23. As in Atteberry I, this evolution necessarily casts doubt both on the general reliability of representations and assurances by Customs officials and on the "presumption of regularity" as it applies to operations of that agency. Atteberry I, Slip Op. 03-53 at 9-11, 27 CIT ___, ____, ____ F. Supp. 2d ____, _____ (May 14, 2003).

A stamp on the back of Customs' Notice of Denial advised that "A denial of a request [for reliquidation] . . . may be protested under 514(a)(7), TA of 1930." And a handwritten notation on the face of the Notice referred Mr. Atteberry to a highlighted passage on a Customs form attached to the document, which stated:

> NOTE:  If your protest is denied, in whole or in part, and you wish to CONTEST the denial, you may do so by bringing a civil action in the U.S. Court of International Trade *within 180 days* after the date of mailing of Notice of Denial.  You may obtain further information concerning the institution of an action by writing the Clerk of U.S. Court of International Trade, One Federal Plaza, New York, NY  10007 (212-264-2800).

(Emphasis added.)  The assessment of duties and interest – much less the *amount* of the assessment – was not mentioned in the Notice of Denial, or in any of  Customs' telephone and e-mail communications with Mr. Atteberry, either before or after the denial.[28]

In the 180 days that followed the April 9, 2002 mailing of the Notice of Denial, Mr. Atteberry evinced his continued interest in challenging Customs' action, through a course of correspondence with the Office of the Clerk of this Court.  By letter dated August 8, 2002, he asked that the Clerk of the Court "send [him] what further information [he] may need to file a civil action" in the Court, giving the Vashon, Washington address as his mailing address.  When he had heard nothing by August 22, 2002, he wrote again to request information "on how to move forward in the appeal process . . . . to further appeal the decision of . . . Customs."

Mr. Atteberry's letter of August 22, 2002 crossed in the mails with a letter of the same date from the Court's Chief Deputy Clerk, which advised Mr. Atteberry that a prospective litigant

---

[28]Pl.'s Letter Memo ¶¶ 1, 4-6, 9, 12-13.

wishing to challenge Customs' denial of a protest "must first exhaust his administrative remedies, and comply with the procedures set forth within Title 28 U.S.C. § 2636 and § 2637." Copies of the statutes were enclosed with the letter, which concluded by noting that the Chief Judge had reviewed Mr. Atteberry's August 8, 2002 letter, had determined that the Court "[did] not have jurisdiction at [the] time over this action," and had instructed the Office of the Clerk not to accept Mr. Atteberry's materials for filing but to instead return the materials to him.[29]

Undeterred, Mr. Atteberry soldiered on. He completed and submitted a Summons, together with a two-page letter dated October 3, 2002 (deemed his Complaint), which were received at the Court and filed on Monday, October 7, 2002. Because that day was the first business day after October 6, which was – in turn – the 181st day following the April 9, 2002 mailing of Customs' Notice of Denial, Mr. Atteberry satisfied the first of two applicable jurisdictional requirements. 28 U.S.C. § 2636(a)(1). *See also* Atteberry I, Slip Op. 03-53, 27 CIT ____, ___ F. Supp. 2d ____ (May 14, 2003). It is, however, undisputed that he did not pay "all liquidated duties, charges, or exactions" before this action was filed, as required by 28 U.S.C. § 2637(a). It is also undisputed that he first learned of the amount of duties and interest assessed only in early January 2003, when he received counsel for Defendant's letter dated December 18, 2002.[30] Mr. Atteberry paid Customs the sum of

---

[29]*See* Letter from Plaintiff to Clerk of U.S. Court of International Trade, dated August 8, 2002; Letter from Plaintiff to Clerk of U.S. Court of International Trade, dated August 22, 2002; Letter from Chief Deputy Clerk of U.S. Court of International Trade to Plaintiff, dated August 22, 2002.

[30]Letter from Counsel for Defendant to Plaintiff, dated December 18, 2002 (requesting, *inter alia*, copies of "any envelopes, papers, items, documents, cancelled checks, or other things . . . which show . . . that [Mr. Atteberry] paid the liquidated duties in this case . . . i.e., a sum which now appears to be $542.11").

$542.00 by personal check dated April 23, 2003.[31]

## II. **Analysis**

The Government paints this action as a "garden variety," open-and-shut case of failure to comply with 28 U.S.C. § 2637. *See*, *e.g.*, Def.'s Letter Memo (noting that "the Government believes that [various questions raised by the Court] are irrelevant to the jurisdictional defect present in this case, i.e., the failure to comply with the requirements of 28 U.S.C. § 2637. There is no doubt that all liquidated duties were not paid prior to the commencement of the action and that plaintiff did not comply with the statute.").

As a sovereign, the United States is immune from suit, unless and except to the extent that it consents to be sued. Georgetown Steel Corp. v. United States, 801 F.2d 1308, 1312 (Fed. Cir. 1986), *quoting* United States v. Mitchell, 445 U.S. 535, 538 (1980). On its face, 28 U.S.C. § 2637 constitutes a waiver of sovereign immunity. Asserting that § 2637(a) waives sovereign immunity – and gives this Court subject matter jurisdiction – over civil actions challenging Customs' denial of a protest "only if all liquidated duties, charges, or exactions have been paid at the time the action is commenced," the Government invokes an unbroken line of cases holding that payment is a strict condition precedent to judicial review.[32] Because Mr. Atteberry failed to make payment before filing

---

[31]*See* PedalPedal Go Karts/Danny Atteberry check for $542.00, payable to U.S. Customs Service, dated April 23, 2003, transmitted by letter from Plaintiff to U.S. Customs Service, dated April 23, 2003.

[32]*See*, *e.g.*, Libas, Ltd. v. United States, 26 CIT ___, 217 F. Supp. 2d 1289 (2002); Washington Int'l Ins. Co. v. United States, 25 CIT ___, ___ n.2, 138 F. Supp. 2d 1314, 1316 n.2 (2001); Dazzle Mfg., Ltd. v. United States, 21 CIT 827, 971 F. Supp. 594 (1997); Group Italglass U.S.A., Inc. v. United States, 17 CIT 1205, 1210-11, 839 F. Supp. 868, 873 (1993) (subseq. history

his summons, the Government contends that this action must be dismissed for lack of jurisdiction. Def.'s Brief at 7-8; Def.'s Reply Brief at 4-7.

However, this action is clearly distinguishable from the line of cases on which the Government relies. None of the cases on which the Government relies involved a claim that Customs had failed to notify the importer of the duties and interest owed. None of the cases on which the Government relies involved a wholesale failure by Customs to comply with its own regulations governing bills for outstanding duties.

Because regular, accurate monthly billing is so central to importers' ability to "perfect" appeals judicial challenges to Customs' denial of protests – because 28 U.S.C. § 2637 plainly

omitted); Peking Herbs Trading Co. v. U.S. Dep't of Treasury, 17 CIT 1182 (1993); Bousa, Inc. v. United States, 17 CIT 144 (1993) (subseq. history omitted); Melco Clothing Co. v. United States, 16 CIT 889, 804 F. Supp. 369 (1992); Mercado Juarez/Dos Gringos v. United States, 16 CIT 625, 796 F. Supp. 531 (1992); Apex Oil Co. v. U.S. Customs Service, 122 B.R. 559, 561 (E.D. Mo. 1990) (subseq. history omitted); Penrod Drilling Co., 13 CIT 1005, 727 F. Supp. 1463 (subseq. history omitted); Atlantic Steamer & Supply Co. v. United States, 12 CIT 479 (1988); Syva Co. v. United States, 12 CIT 199, 681 F. Supp. 885 (1988); Glamorise Foundations, Inc. v. United States, 11 CIT 394, 661 F. Supp. 630 (1987); Nature's Farm Prods., Inc. v. United States, 10 CIT 676, 648 F. Supp. 6 (1986), *aff'd*, 819 F.2d 1127 (Fed. Cir. 1987); Rio Contratos De Costura, S.A. v. United States, 10 CIT 778 (1986); Bulova Watch Co. v. United States, 9 CIT 67 (1985); Am. Air Parcel Forwarding Co. v. United States, 6 CIT 146, 150, 573 F. Supp. 117, 120 (1983) (subseq. history omitted). *Cf*. United States v. Boe, 543 F.2d 151, 155-56 (CCPA 1976); Champion Coated Paper Co. v. United States, 24 C.C.P.A. 83, 90 (1936); Eddietron, Inc. v. United States, 493 F. Supp. 585, 589 (Cust. Ct. 1980); United States v. Novelty Imps., Inc., 341 F. Supp. 1228 (Cust. Ct. 1972), *aff'd*, 476 F.2d 1385 (CCPA 1973).

The sole exception to the "prepayment requirement" is when, as of the date litigation is commenced, Customs already has on hand funds due and owing to the importer which are sufficient to cover the importer's outstanding obligation. Dynasty Footwear v. United States, 4 CIT 196, 551 F. Supp. 1138 (1982). *See also* Mercado Juarez, 16 CIT at 626-27, 796 F. Supp. at 532 (where Government did not object, court – following Eddietron rationale – reallocated plaintiff's partial payment of duties and interest with respect to all entries so as to make full payment on some entries, to perfect jurisdiction over them; remaining entries were dismissed).

contemplates that an importer will be on notice of the sum to be paid – the Government is far too cavalier about Customs' violations of its own regulations and the implications of those violations for subject matter jurisdiction.

### A.  Customs' Failure to Comply With Its Own Regulations

The Government acknowledges that Customs regulations require the agency to bill importers *on a monthly basis* for outstanding duties and interest, "until the bill is paid or otherwise closed." *See* Def.'s Letter Memo ¶ 19 (*quoting* 19 C.F.R. § 24.3a(d)(1) ).  Moreover, the Government admits that Customs failed to do so in this case.  Specifically, the Government concedes that only "a total of four bills were sent to Mr. Atteberry," the last of which "was sent on February 3, 2002." *Id*.  It is thus undisputed that, although Mr. Atteberry notified Customs of his current mailing address (the Vashon, Washington address) in early April 2002, and although Customs mailed its Notice of Denial to him at that address (triggering the statutory 180-day clock for the filing of a civil action in this Court), Customs sent no bills to Mr. Atteberry – *at that or any other address* – during the critical 180-day period when he had to act to perfect jurisdiction.

The Government seeks to explain away Customs' failure to bill Mr. Atteberry as required by its regulations by asserting that the agency is obligated to send bills to the importer's "address of record" and that Mr. Atteberry failed to file a Customs Form 5106 ("Notification of Importer's Number or Application for Importer's Number, or Notice of Change of Name or Address") to update his "address of record" when he left Kenmore, Washington.[33]  Def.'s Letter Memo ¶¶ 19, 23.

---

[33]There are some subtle, inherent inconsistencies in the Government's position here.  It is difficult to square the Government's position that Customs always bills the importer at his "address

However, the regulation that the Government cites is simply inapposite.

of record," and its position that Mr. Atteberry never properly changed his "address of record," with the conceded fact that Customs completely stopped billing Mr. Atteberry at any address. Logically, it would seem that an importer's "address of record" should – like a "last known address" – remain his "address of record" until replaced by a new "address of record." Customs cannot have it both ways. If, by Customs' logic, the Kenmore address remained Mr. Atteberry's "address of record" until changed via some particular form or procedure, then – by Customs' logic – the agency should have continued to send bills to that address.

Moreover, as a practical matter, there is no reason to assume – simply because a single piece of mail is returned to Customs as "undeliverable"– that future mailings to that same address will necessarily be futile. For example, in the case at bar, no one seems to know who wrote "not @ this address" on the face of the envelope enclosing October 2001 bill and then returned it to Customs. In any given case, such an indication might – or might not – be reliable information; pieces of mail have sometimes been known to be *erroneously* returned to sender as "undeliverable." It is also entirely conceivable that an importer might move without filing a change of address in advance. If the importer gave the Postal Service notice of its change of address only after the move, some of the importer's mail would likely have been returned to senders as "undeliverable"; but later mail addressed to the importer's "address of record" on file with Customs would be forwarded to the importer at its new address by the U.S. Postal Service, once the change of address notice filed with the Postal Service took effect. There are other similar potential scenarios as well.

In this case, it is at least conceivable that – if Customs had continued to send bills, *even to the Kenmore address* – one of those bills eventually might have found its way to Mr. Atteberry. *See* Pl.'s Reply Brief at 1-2 (Mr. Atteberry attests that he continued to "check[ ] to see if there was mail from the Address [he] had moved from [i.e., the Kenmore address] for a couple of months after [he] moved. There was nothing from Customs."); Pl.'s Letter Memo II ¶ C (Mr. Atteberry explains that he "did go back out to FREEDOM SK8BOARD SHOP, and . . . asked them if they had any mail for [him], [because] they are the ones [he] would see in that compound [at the Kenmore address]. [He] also saw the owners of the property and they would have told [him] if [he] had mail, in both cases [he] went out there after Oct 19, 01, after [he] got back from Cal. Like by the 2nd week in Nov. and then again in Dec. or Jan of 02.").

It is worth noting that one of the inherent virtues of a regulatory scheme of monthly billing is that, even if one properly-addressed bill is somehow waylaid or lost in the mails, subsequent bills will reach their destination. Thus, in such a scheme, notice is not entirely dependent on any one single bill.

In any event, one thing is certain: Bills that are never sent, by definition, can never be delivered. By electing to completely cease sending bills to Mr. Atteberry, Customs ensured that he would never receive them.

The Government relies on 19 C.F.R. § 24.5(a), which provides, in relevant part:

> Each person, business firm, Government agency, or other organization shall file Customs Form 5106 . . . with the first formal entry which is submitted or the first request for services that will result in the issuance of a bill or a refund check upon adjustment of a cash collection.

But, from the record, it seems clear that Mr. Atteberry did nothing after mid-October 2001 which would trigger any obligations under the regulation. Certainly he did not "submit[ ]" a "formal entry" after that time. Nor does it appear that, during that period, he made a "request for services that [would] result in the issuance of a bill or a refund check." Whatever may have been the intent behind the regulation, nothing on its face applied to Mr. Atteberry.

Moreover, even if § 24.5(a) could be read to apply here, Customs' insistence on the use of a particular form for change of address could not be sustained. *See*, *e.g.*, Intercargo, 83 F.3d at 395 (observing that, although regulation governing extension of liquidations requires that Customs notify surety using a specific form, court "would have no difficulty rejecting" any claim that notice given via some other form was invalid; roundly rejecting contention that notice "that does not strictly conform to the 'form and manner' prescribed in the regulation is ineffective"). *Cf.* Belton Indus., Inc. v. United States, 6 F.3d 756, 761 (Fed. Cir. 1993) (an agency is charged with knowledge of the information in its own files; where objections to proposed revocations and terminations in countervailing duty proceeding were filed on behalf of trade association "and its member companies," Commerce should have accepted objections as filed on behalf of eight member companies, because "Commerce's own files revealed, or should have revealed, the identities of the eight companies" as entities which the agency had previously recognized as "interested parties").

More to the point, Customs cannot deny that it was on *actual notice* of Mr. Atteberry's

current mailing address as of April 2002, when it mailed its Notice of Denial to him at that address. The Government emphasizes that, unlike most other notices generated by Customs, "notices of denials of protests are *not* computer-generated." Def.'s Letter Memo ¶ 23. The Government seeks to depict Customs officials as virtually powerless in the face of the computers of Customs' Automated Commercial System ("ACS"), which are used to generate monthly bills. *See generally id.* ("without [a CF 5106 change of address form], no address changes are authorized to be made by Customs in ACS"; "Customs officials had no authority to input an address change into ACS without a CF 5106"). One is left with the distinct impression that Customs' right hand (*e.g.*, the personnel who were handling billing and other computer-related functions) did not know what its left hand (*e.g.*, Ms. Delgado and other officials at the port) was doing.

An agency's "self-imposed bureaucracy, however, is no excuse" for violating its own regulations. NEC Solutions (America), Inc. v. United States, Slip Op. 03-80 at 12 n.15, 27 CIT ____, _____ n.15, ____ F. Supp. 2d ____, ____ n.15 (July 9, 2003). And, at least for the present, this remains a country governed by laws, which are in turn implemented and enforced by men and women – not computers.[34] Contrary to the Government's claims, neither 19 C.F.R. § 24.5(a), nor

---

[34]The Government's papers convey some vague sense of infallibility on the part of computers and Customs' Automated Commercial System, which is not borne out by the facts of this case (or, for that matter, others). For example, the Government concedes:

> In the present case, Customs sent "demands" to plaintiff's surety . . . monthly on account of Mr. Atteberry's unpaid bill. The first such demand is dated December 2001, but from statements made by Customs officials, it appears that *due to problems with Customs Automated Commercial System ("ACS"), the December bill was not actually mailed to the surety until March 1, 2002.*

Def.'s Letter Memo ¶ 20 (emphasis added).

any other authority cited, prevented Customs from updating the agency's records and databases as

of April 2002 to reflect Mr. Atteberry's current mailing address and then billing him at that address.[35]

Indeed, Customs billing regulations in effect affirmatively required the agency to do so.

By April 9, 2002 at the very latest, Customs was on notice of Mr. Atteberry's Vashon,

Washington address.[36]  Its failure to send him monthly bills at that address thereafter constituted a

---

[35]Indeed, contrary to the Government's assertions, 19 C.F.R. § 24.5(a) does not even purport to address (much less restrict) the circumstances in which "address changes are authorized to be made by Customs in ACS."  *Compare* 19 C.F.R. § 24.5(a) *with* Def.'s Letter Memo ¶ 23.

[36]The primary focus of this analysis of Customs' compliance with its own regulations is on the agency's failure to send the required monthly bills to Mr. Atteberry during the six months following Customs' mailing of the Notice of Denial of Protest on April 9, 2002 – a period which has critical significance for an importer's perfection of jurisdiction in this Court, and during which Customs was on actual notice of Mr. Atteberry's Vashon address (and, indeed, acted on that information by mailing the Notice of Denial to him at that address).

But Customs was arguably in violation of its regulations even before April 2002.  As discussed above, Customs ceased sending monthly bills to Mr. Atteberry – at any address – as of February 2002, notwithstanding 19 C.F.R. § 24.3a(d)(1), which requires monthly billing "until the bill is paid or otherwise closed."  In addition, particularly given Customs' prior pattern and practice of communicating with Mr. Atteberry via telephone and e-mail, it could be argued that the agency was obligated either to bill Mr. Atteberry via e-mail or to contact him (via telephone or e-mail) to obtain a current mailing address for billing purposes as early as December 26, 2002, when Customs received Mr. Atteberry's protest advising that he had "No [mailing] Address at present" but could still be reached via e-mail.  As of that date, the agency was on actual notice that he was no longer at the Kenmore address – the address to which the agency was sending bills.

However, there is no need to here decide whether any acts or omissions by Customs prior to April 2002 constituted regulatory violations.  It is enough to say that where – as of April 9, 2002, at the latest – Customs was on actual notice of Mr. Atteberry's current mailing address and, indeed, used that address to mail its Notice of Denial of Protest to him (thus triggering the 180-day statutory "clock" for purposes of invoking this Court's jurisdiction), Customs was obligated thereafter to bill Mr. Atteberry at that same address.

continuing violation of 19 C.F.R. § 24.3a(d)(1).[37]

## B. The Consequences of Customs' Violation of Its Own Regulations

The determination that Customs stands in violation of its own regulations is not, in and of itself, dispositive of the Government's motion. "There remains the question of what consequence should flow" from those violations. *Cf.* Intercargo, 83 F.3d at 394.

In a line of cases beginning with the seminal Accardi, courts have grappled with the consequences of an agency's violation of its own statute or regulations. United States *ex rel.* Accardi v. Shaughnessy, 347 U.S. 260 (1954) (holding habeus corpus relief proper where agency violated regulations governing procedure for processing and deciding alien's application for suspension of

---

[37]Though it may be somewhat strained to characterize the violations themselves as intentional and deliberate, the underlying decisions and actions by agency officials clearly were.

In other words, as discussed above, the Government notably is not claiming that Customs' failure to update its records (including its computer databases) to reflect Mr. Atteberry's current address in April 2002 was the result of mere inadvertence or mistake. Rather, the Government asserts that some internal agency policy or procedure (apparently based on Customs' reading of 19 C.F.R. § 24.5(a)) precluded agency personnel from doing so. So, too, with Customs' decision to cease all billing of Mr. Atteberry after the fourth bill was sent – albeit to the Kenmore address – in early February 2002. (As discussed in note 26 above, the record gives no indication why the billing stopped, although it seems likely that it was because the October 2001 bill was returned to the agency as undeliverable.) In any event, *someone* at Customs made an intentional, deliberate decision to stop sending bills to Mr. Atteberry at any address.

The agency's failure to send monthly bills to Mr. Atteberry at his Vashon, Washington address beginning in April 2002 was thus the product of intentional, deliberate actions and decisions of Customs officials – whether taken with specific knowledge of this particular case, or more generally in the adoption of problematic internal policies and procedures on matters such as maintaining and updating records of importers' "addresses of record," the sharing of data and information among Customs personnel, and the inputting of data into the ACS computer system.

deportation).[38]  This Court and the Court of Appeals for the Federal Circuit have made their own

substantial contributions to that body of law.  *See*, *e.g.*, Liesegang v. Sec'y of Veterans Affairs, 312

F.3d 1368 (Fed. Cir. 2002); Intercargo, 83 F.3d 391; Kemira Fibres Oy v. United States, 61 F.3d 866

(Fed. Cir. 1995); Belton Indus., 6 F.3d 756;  Neenah Foundry Co. v. United States, 25 CIT _____, 142

F. Supp. 2d 1008 (2001); Cummins Engine Co. v. United States, 23 CIT 1019, 83 F. Supp. 2d 1366

(1999).

Although most of the caselaw concerns agency failures to observe timing requirements, some

cases address other types of violations.  *Compare*, *e.g.*, James Daniel Good, 510 U.S. 43 (violation

of statutory requirements concerning timing of Customs reporting and of commencement of

proceedings concerning forfeitures) *and* Kemira, 61 F.3d 866 (violation of Commerce Department

regulations concerning timing of publication of notice of intent to revoke antidumping finding), *with*

Yellin, 374 U.S. 109 (violation of congressional committee rules requiring consideration of witness's

request to be heard in executive session) *and* Intercargo, 83 F.3d 391 (failure of notice form to cite

any of three possible statutory grounds for Customs' extension of liquidation period).

As it has evolved, this line of precedent recognizes that "[a]n executive agency must be

rigorously held to the standards by which it professes its action to be judged."  Vitarelli v. Seaton,

359 U.S. at 546  (Frankfurter, J., concurring in part and dissenting in part).  Thus, "regulations

validly prescribed by a government administrator are binding upon him as well as the citizen, . . .

---

[38]*See*, *e.g.*, Service v. Dulles, 354 U.S. 363 (1957); Vitarelli v. Seaton, 359 U.S. 535 (1959); Yellin v. United States, 374 U.S. 109 (1963); Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532 (1970); United States v. Caceres, 440 U.S. 741 (1979); Cornelius v. Nutt, 472 U.S. 648 (1985); Brock v. Pierce County, 476 U.S. 253 (1986); United States v. Montalvo-Murillo, 495 U.S. 711 (1990); United States v. James Daniel Good Real Prop., 510 U.S. 43 (1993).

even when the administrative action under review is discretionary in nature." Service v. Dulles, 354

U.S. at 372 (*citing* Accardi, 347 U.S. 260 (1954) ).  Moreover, "[w]here the rights of individuals are

affected, it is incumbent upon agencies to follow their own procedures. . . .even where the internal

procedures are possibly more rigorous than otherwise would be required." Morton v. Ruiz, 415 U.S.

199, 235 (1974) (citations omitted).  "Accordingly, if [agency action] is based on a defined

procedure, even though generous beyond the requirements that bind such agency, that procedure

must be scrupulously observed. . . . This judicially evolved rule of administrative law is now firmly

established . . . .   He that takes the procedural sword shall perish with that sword." Vitarelli v.

Seaton, 359 U.S. at 546-47 (Frankfurter, J., concurring in part and dissenting in part).

At the same time, the Supreme Court "has frequently articulated the 'great principle of public

policy, applicable to all governments alike, which forbids that the public interests should be

prejudiced by the negligence of the officers or agents to whose care they are confided.' " Brock, 476

U.S. at 260 (*quoting* United States v. Nashville, Chattanooga & St. Louis Railway Co., 118 U.S. 120,

125 (1886)) (other citations omitted).  The caselaw therefore disavows any "presumption or general

rule that for every duty imposed upon . . . the Government . . . there must exist some corollary

punitive sanction for departures or omissions, even if negligent." Montalvo-Murillo, 495 U.S. at 717

(citation omitted).  Rather, the courts have emphasized that "many statutory requisitions intended

for the guide of officers in the conduct of business devolved upon them . . . do not limit their power

or render its exercise in disregard of the requisitions ineffectual." French v. Edwards, 13 Wall. 506,

511 (1872), *quoted in* Montalvo-Murillo, 495 U.S. at 717-18.

Balancing these competing interests, the Supreme Court has held that "if a statute [or, for that

matter, a regulation] does not specify a consequence for noncompliance with [its] timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." James Daniel Good, 510 U.S. at 63-64 (citations omitted).  Thus, "not every failure of an agency to observe timing requirements voids subsequent agency action."  Kemira, 61 F.3d at 871 (*citing* Brock, 476 U.S. at 260).  Nor is the Brock  rule limited to violations of timing requirements; it extends to violations of other procedural requirements as well.  The Brock Court noted that it "would be most reluctant to conclude that every failure of an agency to observe a *procedural requirement* voids subsequent agency action, especially when important public rights are at stake."  Brock, 476 U.S. at 260 (emphasis added).  Thus, the Court concluded, "[w]hen . . . there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act."  *Id.* (footnote omitted).

The teachings of Accardi and its progeny are clear enough.  What is entirely unclear are the implications, if any, of that line of cases for the case at bar.  Significantly, as the quotes from Brock above indicate, the remedy sought by the plaintiffs in Accardi and the cases that followed was the ultimate remedy – to "void[ ] subsequent agency action."  That plainly is not the situation here. *Compare*, *e.g.*, Accardi, 347 U.S. 260 (admittedly deportable immigrant sought to vacate agency decision denying suspension of deportation); Yellin, 374 U.S. 109 (witness who refused to answer questions of House Committee on Un-American Activities sought reversal of conviction for contempt of Congress); Brock, 476 U.S. 253 (county sought to avoid repayment of misused federal grant funds); Cornelius v. Nutt, 472 U.S. 648 (federal employees sought to overturn discharges from employment); Montalvo-Murillo, 495 U.S. 711 (criminal suspect who was clear flight risk sought

to establish right to release from pre-trial custody); James Daniel Good, 510 U.S. 43 (sought

dismissal of civil forfeiture action); Kemira, 61 F.3d 866 (importer sought revocation of

antidumping finding against it); Intercargo, 83 F.3d 391 (importer's surety sought to invalidate

Customs' notice of liquidation of extension and thus to entirely avoid obligation to pay duties);

Cummins Engine Co., 23 CIT 1019, 83 F. Supp. 2d 1366 (importer sought to void liquidation of

merchandise as non-originating under NAFTA).

Accardi and its progeny are thus distinguishable from this case. Mr. Atteberry is not here

"playing 'gotcha.' " Unlike the plaintiffs in Accardi and the other cases cited above, he is not seeking

"the ultimate remedy." He is not arguing that he is now "immune" from the collection of duties

simply because Customs failed to comply with its own regulations. He makes no claim that, by

failing to bill him regularly, Customs has forfeited forever whatever right it may have to exact duties

on the merchandise at issue. Quite the contrary – Mr. Atteberry seeks only to protect his right to a

*judicial determination* on the *merits* of Customs' right to exact those duties.[39]  *Compare*, *e.g.*,

---

[39]Mr. Atteberry thus is not seeking a "windfall." *Compare*, *e.g.*, Montalvo-Murillo, 495 U.S. at 720 ("there is no reason to bestow upon the defendant a windfall and to visit upon the Government and the citizens a severe penalty by mandating release of possibly dangerous defendants every time some deviation from the strictures of [the Bail Reform Act] occurs.").

Indeed, the contrary result – sustaining the Government's position – would confer a "windfall" on the United States and its citizens at Mr. Atteberry's expense, by permitting the Government to "profit" from Customs' violation of its own regulations. Even if Mr. Atteberry is wrong about the merits of his claim against Customs, precluding him from litigating it would unjustly enrich the coffers of the Treasury – at the expense of his statutory right to a judicial determination on the merits – by sparing the Government the costs of that litigation. And if Mr. Atteberry is right about the merits of his case but were to be prevented from litigating it, the coffers of the Treasury would be unjustly enriched even more, by his payment of duties and interest to which the Government is not entitled.

Montalvo-Murillo, 495 U.S. at 720 ("The safety of society does not become forfeit to the accident of noncompliance with statutory time limits where the Government is [belatedly] ready and able to come forward with the requisite showing to meet the burden of proof [to justify pre-trial detention] required by the [Bail Reform Act]."); Kemira, 61 F.3d at 873 ("Kemira should not become immune from the antidumping laws because Commerce missed the deadline."); Intercargo, 83 F.3d at 396 ("The public interest in the administration of the importation laws should not 'fall victim' to the failure by the Customs Service to use the requisite language in its [liquidation] extension notices, if the oversight has not had any prejudicial impact on the plaintiff.").

The more recent cases involving Accardi-type claims that an agency's violation of its statute or regulations voids subsequent agency action reflect a clear two-step analysis. The court first considers whether the statute or regulation at issue specifies the consequences of agency noncompliance. If it does, that is the end of the matter. *See*, *e.g.*, James Daniel Good, 510 U.S. at 64-65 (where "[e]xamination of the structure and history of the internal timing provisions [of the statute] . . . supports the conclusion that the courts should not dismiss a [civil] forfeiture action for noncompliance," Court does not reach issue of prejudice).

On the other hand, if (as is generally the case) the statute or regulation in question does not address the consequences of an agency's failure to comply, the court proceeds to the second step of the analysis, and determines whether the agency's violation may have prejudiced the plaintiff. *See*, *e.g.*, Intercargo, 83 F.3d at 396 (where plaintiff received formal notice that liquidation period was being extended and "omission of the requisite language from the extension notices had no effect on Intercargo's right to challenge the extensions," court "think[s] it clear that Intercargo suffered no

prejudice"); <u>Belton Indus.</u>, 6 F.3d at 761 (where appellees' counsel had – and, indeed, acted on – actual notice of agency's proposed termination of countervailing duty orders, "Commerce's violation [of regulation requiring agency to give formal written notice to appellees themselves] did not prejudice [them]").

Although it is far from certain whether Mr. Atteberry's claim should properly be subjected to this two-step analysis (because, again, unlike the plaintiffs in <u>Accardi</u> and the cases that have followed it, Mr. Atteberry is not seeking to "void[ ] subsequent agency action"), his claim would survive such an analysis (if indeed it is applicable) and would entitle him to relief.[40]

The first step of the analysis requires little ink. Neither Customs' billing regulations nor the related statute – 19 U.S.C. § 1505 – speak to the consequences of an agency failure to comply. The histories of the relevant provisions are similarly silent. The analysis therefore turns to the second step – the question of prejudice.[41]

_____

[40]<u>Intercargo</u>, 83 F.3d at 394 – and cases that have followed it, such as <u>Cummins Engine Co.</u>, 23 CIT at 1032, 83 F. Supp. 2d at 1378 – can be read to extend <u>Accardi</u> and its progeny by requiring "harmless error" analysis in *every* case involving an agency's violation of its statute or regulations, without regard to the nature and extent of the remedy sought by the complainant. But it is not clear that <u>Intercargo</u> and <u>Cummins</u> should be read so broadly. Notably, the plaintiffs in both of those cases, like all the complainants in the <u>Accardi</u> line of cases, were seeking the "ultimate remedy" – to void subsequent agency action.

If the two-step test set forth in the progeny of <u>Accardi</u> is to be used to determine whether or not subsequent agency action is invalidated, it stands to reason that some other test must govern whether a complainant is entitled to lesser relief, such as that which Mr. Atteberry here seeks.

[41]The caselaw indicates that a showing of prejudice is required only if the violation is of a "procedural" requirement – or, in other words, that prejudice is presumed if the requirement at issue is "substantive." *See*, *e.g.*, <u>Kemira</u>, 61 F.3d at 875 ("Since the requirement at issue is merely procedural, Kemira must establish that it was prejudiced by Commerce's noncompliance . . ."). For purposes of this analysis of Mr. Atteberry's claim (above), it is assumed (but not decided) that

"Prejudice, as used in this setting, means injury to an interest that the statute, regulation, or rule in question was designed to protect." Intercargo, 83 F.3d at 396 (citations omitted).[42] While Customs' billing regulations may be designed, in some measure, to facilitate the operations of the agency and to protect the public fisc, their primary purpose is to ensure that importers have notice of the precise extent of their financial obligations (for jurisdictional and other reasons).[43] Viewed in the context of the entire statutory and regulatory scheme, the "notice" function of a bill for supplemental duties and interest accrued to date is both obvious and critical – particularly in light of 28 U.S.C. § 2637(a), the strict prepayment requirement which is a condition precedent to judicial

Customs' billing regulations – including 19 C.F.R. § 24.3a(d)(1), in particular – are "procedural."

As courts have recognized time and time again over the years, however, the distinction between "procedural" and "substantive" is an elusive one. It is not a distinction that is easily drawn in any context, for any purpose. Because cases are so fact-specific, the terms often seem to be essentially result-driven labels. *See generally* Neighborhood TV Co. v. FCC, 742 F.2d 629, 636-37 (D.C. Cir. 1984) (*quoting* Brown Express, Inc. v. United States, 607 F.2d 695, 701 (5th Cir. 1979)) ("'Procedure' and its opposite, 'substance,' are not talismanic labels or given premises. Rather, they are legal conclusions which depend on their settings for definition.").

[42]In discussing prejudice, the courts have used various terms interchangeably – including "harmless error," "harmful error," and "substantial prejudice," in addition to "prejudice." *See, e.g.*, Intercargo, 83 F.3d at 394 (referring to "principles of harmless error," "[t]he harmless error rule," "prejudicial error," and "conventional principles of harmless error"), 396-97 (discussing "prejudice"); Cornelius v. Nutt, 472 U.S. at 657-59 (discussing "harmful error"); Kemira, 61 F.3d at 875 (discussing "substantial prejudice") (*quoting* American Farm Lines, 397 U.S. at 539).

[43]Thus, for example, under Customs' regulations, it is not the act of liquidation – but, rather, the bill for supplemental duties and interest – that triggers the importer's obligation to pay. *See* 19 C.F.R. § 24.3(e) (bills for duties and interest are "due and payable within 30 days *of the date of issuance of the bill*") (emphasis added). *See also* 19 U.S.C. § 1505(b) ("Duties, fees, and interest . . . are due 30 days *after issuance of the bill*") (emphasis added). Moreover, billing is mandatory under the statutory and regulatory scheme. It is no mere "courtesy" or formality. *Cf.* 19 C.F.R. § 159.9(d) ("Customs *will endeavor* to provide importers . . . with Customs Notice Form 4333-A, 'Courtesy Notice,' . . . . This notice shall serve as *an informal, courtesy notice* and *not as a direct, formal and decisive notice* of liquidation.") (emphases added).

review of Customs' denial of an importer's protest.  *See* section I.A, *supra*.[44]

Mr. Atteberry has repeatedly explained that he did not pay the outstanding duties and interest prior to filing this action because he never received a bill.[45]  And it is that failure to pre-pay which the Government argues should deprive Mr. Atteberry of his right to a judicial determination on his challenge to the assessment of those duties and interest.  Stated another way, had Mr. Atteberry pre-paid the duties and interest – which he asserts he would have done if he had received a bill – the Government would have no grounds on which to challenge his right to pursue this action on the merits.  Clearly, the potential deprivation of a litigant's right to his "day in court" constitutes

---

[44]*Cf.* New Zealand Lamb Co. v. United States, 40 F.3d 377, 381-82 (Fed. Cir. 1994) (holding that, where bulletin notices made no mention of interest, jurisdictional 90-day period for filing of protest did not begin to run until Customs sent importer a bill for interest; proper notice requires that party assessed be "informed of all elements of the charge:   liability and quantum, either or both of which it may wish to protest"); Am. Motorists Ins. Co. v. United States, 14 CIT 298, 303, 737 F. Supp. 648, 652 (1990) (sustaining adequacy of notice provided by Formal Demand on Surety – equivalent to a bill sent to an importer, *see* n.8, *supra* – where demand specified, *inter alia*, "the *amount due* – listing separately for each bill the *total amount*, *principal amount*, and *interest amount* due, and the 'age category' of the bills – either 60, 90, or 120 days, or longer") (emphases added); The A.W. Fenton Co. v. United States, 55 Cust. Ct. 74, 80 (1965) (in context of Tariff Act of 1930, linking importer's need to know more than merely the "approximate[ ]" sum due if he is to be required to make payment; noting "rational basis" for not requiring pre-payment of duties as prerequisite to protest by importer for reappraisement because such an importer "has not had his duty liquidated and does not know, except approximately, and not always that, what the liquidation duty will be.").

[45]A searching review of the record as a whole indicates that Mr. Atteberry understood that Customs had decided that his merchandise could not be liquidated duty-free, and he expected that he would be billed for supplemental duties – he just didn't know precisely when.  Indeed, he expected that he would be billed periodically, on a regular basis (as, in fact, Customs regulations require).  *See*, *e.g.*, Pl.'s Letter Memo I ¶¶ 4 ("I knew that the Government was going to impose [supplemental duties], [as for] when I did not know."), 13 ("I . . . believed [Customs had] to ask for $$$"); Pl.'s Letter Memo II ¶ D ("[A]s for duties I was sure they [Customs] would Notify me, some how and differently with repeat notices or requests that I must pay some duties, some form of mentioning that I owed them.").

prejudice to his interests. Indeed, there could be no greater deprivation for an importer than to cut off his right to judicial review of an adverse Customs determination. *See*, *e.g.*, Loui v. Merit Sys. Prot. Bd., 25 F.3d 1011, 1014 (Fed. Cir. 1994) (agency's late notice, which resulted in employee's loss of right to appeal, was "obviously not 'harmless error'").[46]

It is no answer to label as mere speculation Mr. Atteberry's assertion that he would have pre-paid the duties and interest had he received a bill, and thus would have perfected jurisdiction as contemplated by the statute. Nothing remotely approaching metaphysical certainty is required. *See*, *e.g.*, Cornelius v. Nutt, 472 U.S. at 650 (endorsing agency's interpretation of statutory "harmful error" standard as "error that causes substantial prejudice to [an employee's] individual rights by *possibly affecting* the agency's decision") (emphasis added), *cited with approval in* Kemira, 61

---

[46]In contrast, the Government doesn't even claim to have been prejudiced. Certainly, the Government cannot claim to have been lulled into complacency; nothing in Mr. Atteberry's conduct could have led the Government to believe that he was abandoning his claim. He has vigorously prosecuted his case at every stage throughout the administrative process, and into this forum.

Moreover, the accrual of interest compensates the Government for the loss of use of funds it suffered due to delay in payment. (Significantly, although it might be possible to frame a colorable argument that the accrual of interest was tolled for a substantial period of time here, Mr. Atteberry has not sought any such relief. He has now paid much of the supplemental duties assessed by Customs (together with accrued interest), though apparently he still has not been billed.) Finally, the Government will be free to renew its motion to dismiss if Mr. Atteberry fails to promptly perfect jurisdiction after he is properly billed for the nominal sum that remains outstanding. *Compare* Kemira, 61 F.3d at 873 ("Any harm caused to Kemira by the slight delay in administrative action (and none has been shown) would be disproportionate to the potential harm to domestic industry were we to accept Kemira's argument. We therefore reject the position that Commerce lost its authority to commence an administrative review because of its delay in giving notice [in violation of its regulations].").

F.3dat 875 (discussing requirement to show prejudice) *and* <u>Belton Indus.</u>, 6 F.3d at 761 (same).[47]

Nor is it an answer to argue, as the Government does, that – even absent a bill – "[a] simple inquiry [by Mr. Atteberry] as to how much duties he owed would have led to his knowledge of the exact amount of the outstanding duties."  Def.'s Letter Memo ¶ 22.  It would be quite a different

---

[47]*See* <u>Cornelius v. Nutt</u>, 472 U.S. at 657 n.9 (noting that, in a judicial context, "harmful error" means "error that has *some likelihood* of affecting the result of the proceeding") (emphasis added) (*citing* <u>United States v. Hasting</u>, 461 U.S. 499 (1983); <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946) ).  The <u>Hasting</u> Court described as "the essence of the harmless error doctrine that a judgment may stand only when there is *no 'reasonable possibility* that the [practice] complained of *might have contributed to'*" the outcome.  461 U.S. at 506 (emphases added) (citation omitted).  In <u>Kotteakos</u>, the Court emphasized that the "harmless error" rule is a rule in name only, and that the art is in its application, requiring "judgment transcending confinement by formula or precise rule . . . That faculty cannot ever be wholly imprisoned in words, much less upon such a criterion as what are only technical, what substantial rights; and what really affects the latter hurtfully . . . . *What may be technical for one is substantial for another*; *what minor and unimportant in one setting crucial in another*."  328 U.S. at 761 (emphasis added) (citation omitted).

*See also*, *e.g.*, <u>Small Refiner Lead Phase-Down Task Force v. EPA</u>, 705 F.2d 506, 521 (D.C. Cir. 1983) (in context of APA review of agency action, court must apply rule of prejudicial error, which "requires only a *possibility* that the error would have resulted in *some change*" in the outcome) (emphases added), *quoted with approval in* <u>Evans v. Perry</u>, 944 F. Supp. 25, 29 (D.D.C. 1996) (citation omitted); <u>Yellin</u>, 374 U.S. at 120-21(analogizing position of witness convicted on charges of contempt of Congress for refusing to answer questions posed to him in open session by House Committee on Un-American Activities to the position of petitioner in <u>Accardi</u>, who applied to the Board of Immigration Appeals for suspension of deportation and, when suspension was denied, asserted that the BIA had not exercised the full discretion delegated to it by the Attorney General, because it was influenced by a list of "unsavory characters" to be deported which the Attorney General released shortly before his application was denied; holding that "This Court held [in <u>Accardi</u>] that the Board had failed to exercise its discretion though required to do so by the Attorney General's regulations.  Although *the Court recognized that Accardi might well lose*, *even if the Board ignored the Attorney General's list of unsavory characters*, it nonetheless held that Accardi should at least have the chance given to him by the regulations.  The same result should obtain in the case at bar.  *Yellin might not prevail*, *even if the [congressional] Committee takes note of the risk of injury to his reputation or his request for an executive session*.  But he is at least entitled to have the Committee follow its rules and give him consideration according to the standards it has adopted in [those rules].") (emphases added).

matter if Mr. Atteberry was, in fact, on actual notice of the sum due before he filed this action. *See*, *e.g.*, Belton Indus., 6 F.3d at 761 (where appellees' counsel had – and, indeed, acted on – actual notice of agency's proposed action, "Commerce's violation [of regulation requiring agency to give formal written notice to appellees themselves] did not prejudice [them]").[48] But the Government makes no such claim here. Instead, the Government is arguing, in essence, that a party has an affirmative duty to take action to mitigate the effects of an agency's violation of its own regulations.

In effect, the Government argues that the two-step analysis set forth in the cases that follow Accardi is, in reality, a *three-step* analysis: (1) Does the statute or regulation speak to the consequences of the agency's failure to comply? If no, then (2) did the agency's violation prejudice the complainant? If yes, then (3) could/should the complainant have done something to prevent that harm?

Not only is the Government's argument questionable as a matter of policy,[49] but – more

---

[48]Also untenable is any claim that Customs' billing regulations themselves sufficed to put Mr. Atteberry on notice of the amount he owed. *See generally*, *e.g.*, Kemira, 61 F.3d at 875 (rejecting argument that "Commerce need not [provide specific written notification to] interested parties in accordance with [a regulation requiring such notice] because the regulation itself places the domestic industry on notice of Commerce's intent to revoke after four consecutive anniversary months"; court reasoned, *inter alia*, that accepting such an argument would render the regulation requiring specific written notice to interested parties "superfluous"); New Zealand Lamb, 40 F.3d at 381 (dismissing Customs' argument that regulation providing for interest was itself sufficient to put importer on notice of assessment of interest).

[49]It is a fairly extraordinary proposition to posit that it is the job of private parties to police Executive Branch agencies in the performance of their jobs. Nor should a private party be required to undertake extraordinary measures to force an agency to do that which the law already specifically requires it to do. *See* NEC Solutions (America), Inc. v. United States, Slip Op. 03-80 at 12 n.15, 27 CIT ____, ____ n.15, ____ F. Supp. 2d ____, ____ n.15 (July 9, 2003) (rejecting the Government's "brazen[ ] claims" that a party who believes it will be injured by an agency's violation of its own statute " 'is not without remedy' because it can seek relief by petitioning for a writ of mandamus")

importantly – it finds no support in the law.  There is nothing in the <u>Accardi</u> line of cases to suggest

that, in circumstances such as these, establishing "prejudice" requires a showing of due diligence.[50]

_____

(citation omitted).

[50]A showing of due diligence is required for certain types of equitable relief.  *See*, *e.g.*, <u>US JVC Corp. v. United States</u>, 22 CIT 687, 690 n.6, 691, 15 F. Supp. 2d 906, 910 n.6, 911 (1998), *aff'd*, 184 F.3d 1362 (Fed. Cir. 1999) (doctrine of equitable tolling requires showing of due diligence; equitable estoppel does not); <u>Former Employees of Quality Fabricating, Inc. v. U.S. Sec'y of Labor</u>, 27 CIT ____, ____, 259 F. Supp. 2d 1282, 1285 (2003) (equitable tolling requires due diligence).

However, this opinion does not rely on any equitable doctrine.  Accordingly, there is no relevance here to the line of precedent holding that equitable relief from the terms of 28 U.S.C. § 2637(a) is not available, because it involves a sovereign (rather than proprietary) governmental function – "the collection or refund of duties on imports." *See*, *e.g.*, <u>Dazzle Mfg.</u>, 21 CIT at 830, 971 F. Supp. at 597 (*quoting* <u>Air-Sea Brokers</u>, 596 F.2d at 1011); <u>Mercado Juarez</u>, 16 CIT at 627, 796 F. Supp. at 533. *Cf.* <u>New Zealand Lamb Co. v. United States</u>, 149 F.3d 1366, 1368 (Fed. Cir. 1998) (equitable estoppel not available against the Government in cases involving the collection or refund of duties on imports) (citations omitted). *But see* <u>Atlantic Steamer</u>, 12 CIT at 480 (noting that, under different circumstances, "the Court might have found some equitable grounds to infer due diligence on the part of the plaintiff and somehow brought the case within the requirements of § 2637(a)"); <u>US JVC Corp.</u>, 22 CIT at 690 n.6, 15 F. Supp. 2d at 910 n.6 (criticizing some of the reasoning in <u>Dazzle Mfg.</u>).

There is, similarly, no occasion here to consider whether the facts of this case would support a claim of equitable estoppel, much less the extent to which the doctrine can operate against the Government.  Nor is there occasion to consider whether, under some ingenious theory, it could be argued that the 180-day statutory "clock" for the filing of an action in this court has not yet been triggered (or, at a minimum, did not expire before Mr. Atteberry tendered his payment of $542 – the sum cited by the Government as due and payable in its Reply Brief here). *Cf.* <u>New Zealand Lamb Co.</u>, 40 F.3d 377, 381-82 (holding that, where liquidation notices made no mention of interest, 90-day statutory limitations period for filing of protest was not triggered until Customs rendered bill detailing amount of interest owed).

Finally, where – as here – the agency's actions are in violation of a statute or regulation, there is no need to decide whether the failure to give notice constituted a violation of the Constitution.  Neither party here has framed the issue in those terms, although Constitutional concerns of notice and due process are implicated in any such case.

Moreover, as a practical matter, this case itself illustrates the folly of any suggestion that a simple phone call to Customs would have yielded the accurate, detailed and precise information which the required bills would have provided to Mr. Atteberry. If – in the relative calm, deliberate and rarefied atmosphere of litigation – there is room for confusion on the part of the Government as to the precise amount owed at a given point in time (*see* n.10, *supra*), it requires little imagination to envision the potential for misinformation and miscommunication in the much more rough-and-tumble environment of routine, day-to-day dealings between importers and Customs, with dire consequences for importers. The courts would be called on to referee "he said/she said" disputes pitting an importer against an individual Customs official in a debate over who said what when, as well as arguments about whether or not it was reasonable under the circumstances for an importer to rely on the representations of that – or any other – individual Customs employee.

### III. **Conclusion**

Although this case is at the frontier of the law where subject matter jurisdiction and sovereign immunity intersect with the law on an agency's violation of its own statute or regulations, it represents no grand assault on the citadel of sovereign immunity. The holding here is very limited indeed.

This case stands for nothing more – but also nothing less – than the proposition that (under the Accardi line of cases, or otherwise) where Customs was on actual notice of an importer's current mailing address (and, in fact, used that address to mail its Notice of Denial of Protest to him), thus triggering the 180-day statutory "clock" for purposes of invoking this Court's jurisdiction, the agency was thereafter obligated to bill the importer at that same address; and where Customs failed – in

violation of its own regulations – to send the importer even a single bill at that address at any point during the critical 180-day period that followed, the importer must have not the "ultimate remedy," but *a remedy*.

Permitting the Government now (however belatedly) to bill Mr. Atteberry – and permitting Mr. Atteberry to pay that bill in full, to perfect jurisdiction – has, in the words of the Supreme Court, both "causal [and] proportional relation to [the] harm caused" by Customs' flagrant, protracted and continued violation of its billing regulations.  Montalvo-Murillo, 495 U.S. at 721.

Because 28 U.S.C. § 2637(a) clearly contemplates that an importer will be on notice of the sum to be paid, and because Customs' failure to render monthly bills – in violation of its own regulations –  deprived Mr. Atteberry of that notice, the Government's motion to dismiss for lack of subject matter jurisdiction pursuant to that provision of the statute must be, and hereby is, denied.

_____
                              Delissa A. Ridgway
                              Judge

Dated:   July 28, 2003
             New York, New York

ERRATA


<u>Daniel Atteberry v. United States</u>, Court No. 02-00647, Slip Op. 03-93, dated July 28, 2003.


Page 14:     In penultimate line of second paragraph of footnote 27, replace "<u>Atteberry I</u>," with "<u>Atteberry v. United States</u>,".

In last line of second paragraph of footnote 27, replace "(May 14, 2003)." with "(May 14, 2003) ("<u>Atteberry I</u>")."

Page 18:     In line 9, delete "appeals".